2004-NMSC-030

98 P.3d 699

**STATE of New Mexico, Plaintiff–Petitioner,**

v.

**Mario Hector ALVAREZ–LOPEZ, Defendant–Respondent.**

**State of New Mexico, Plaintiff–Respondent,**

v.

**Mario Hector Alvarez–Lopez, Defendant–Petitioner.**

Nos. 27,868, 27,869.

Supreme Court of New Mexico.

Aug. 20, 2004.

Patricia A. Madrid, Attorney General, Patricia A. Gandert, Assistant Attorney General, Santa Fe, NM, for State.

John Bigelow, Chief Public Defender, Laurel A. Knowles, Assistant Appellate Defender, Santa Fe, NM, for Defendant.

## OPINION

MINZNER, Justice.

{1} Defendant Mario Hector Alvarez–Lopez was convicted by a jury of aggravated burglary, contrary to NMSA 1978, § 30–16–4 (1963); conspiracy to commit burglary, contrary to NMSA 1978, § 30–28–2 (1979); and one count each of larceny over $250 and larceny of a firearm, contrary to NMSA 1978, § 30–16–1 (1987). At Defendant's trial, the district court admitted into evidence under the hearsay exception for statements against penal interest, *see* Rule 11–804(B)(3) NMRA 2004, certain hearsay statements by an accomplice made while in custody. On appeal, the Court of Appeals held the admission of those statements did not violate Defendant's Sixth Amendment right to confrontation, but the Court also held Defendant's convictions for both larceny over $250 and larceny of a firearm violated his Fifth Amendment right not to be placed in double jeopardy. *State v. Alvarez–Lopez*, 2003–NMCA–039, ¶ 35, 133 N.M. 404, 62 P.3d 1286. Both Defendant and the State petitioned us to review the Court of Appeals' opinion. We granted certiorari on both petitions pursuant to NMSA 1978, § 34–5–14(B) (1972) and Rule 12–502 NMRA 2004. We now consolidate the two appeals pursuant to Rule 12–202(F)(2) NMRA 2004 and reverse.

{2} The parties briefed the issues on which we granted certiorari, and we heard oral argument. After oral argument and before

rendering our opinion in this case, the United State Supreme Court decided *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which substantially altered the federal Confrontation Clause analysis for statements against penal interest. Consequently we ordered supplemental briefing. In briefing, the State raised the possibility Defendant had forfeited his constitutional right to confrontation by absconding before his trial. We hold he did not. We also hold under *Crawford* the district court erred in admitting into evidence testimonial statements made by an accomplice inculpating Defendant. "Where testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 1374. Finally, we hold the error was not harmless beyond a reasonable doubt. Because the issue may arise on remand, we also hold Defendant was not placed in double jeopardy by his convictions for both larceny over $250 and larceny of a firearm. As a result of our holding on Defendant's Confrontation Clause claim, we reverse each of his convictions; however, on remand, if the State retries Defendant, the Double Jeopardy Clause does not prevent Defendant from being convicted of both larceny over $250 and larceny of a firearm.

## I

{3} On April 19, 1993, the victim's house was burglarized. The victim testified he was at work that day when he received a phone call informing him that someone was looking in a window of his mobile home. He drove home to check on the situation and when he arrived the victim saw a turquoise car parked in front of his residence. Defendant appeared from behind the house. The victim asked him what he was doing and Defendant told the victim he was looking for someone who dealt with horses. The victim told him there were no horses there and the man got in the turquoise car and drove away. The victim then walked behind his house and encountered a man later identified as Benjamin Perches coming out of the residence carrying a tape measure and a box cutter belonging to the victim. Perches spoke only Spanish and could not say what he had been

doing in the house. The victim went into the mobile home and found his VCR, shoes, and guns piled in the hallway. The victim came back outside and held Perches at gunpoint until the police arrived and arrested him.

{4} At the sheriff's department, Perches waived his right to remain silent and described the burglary to Sgt. Ed Miranda. Perches claimed that Defendant wanted to burglarize a house and planned the burglary. When they got to the victim's house, Defendant broke a window with a tire iron to gain entry into the house. Perches stated he only wanted to take a VCR and some shoes from the house, but Defendant broke into the victim's gun cabinet and gathered rifles. While Perches was trying to take the VCR, Defendant told him, "Let's go! Let's go! Bring the rifles and let's go." As Perches was leaving the house, he was stopped and questioned by the victim. The victim went inside his house, and when he came back he held Perches at gunpoint until officers from the sheriff's department arrived. During the interrogation, Perches admitted he went into the house and took the VCR, but claimed Defendant was the one who took the rifles.

{5} Defendant was indicted in April 1993. Following his indictment, Defendant absconded and was a fugitive for over seven years. In July 2000, Defendant informed the district court that he was incarcerated on federal charges. Perches had completed his prison sentence and had been deported to Mexico the previous month. The State unsuccessfully attempted to locate Perches to have him testify at Defendant's trial. The district court found Perches' statements to the police admissible as statements against penal interest under Rule 11–804(B)(3) and allowed Sgt. Miranda to summarize the statements to the jury. Defendant was convicted of aggravated residential burglary, conspiracy to commit residential burglary, larceny over $250, and larceny of a firearm. The Court of Appeals affirmed each conviction, other than the conviction for larceny over $250. *See Alvarez–Lopez*, 2003–NMCA–039, ¶ 35, 133 N.M. 404, 62 P.3d 1286.

## II

{6} We first address the issues raised by Defendant's appeal, arising out of the admis-

sion of Perches' statements. Defendant argues his constitutional right to confrontation was violated when the district court allowed Sgt. Miranda to summarize for the jury Perches' statements made to him during interrogation. In addressing this argument, we must determine whether Defendant forfeited his right to confrontation by absconding, whether his right to confrontation was actually violated, and, if so, whether that violation can be deemed harmless. The Confrontation Clause of the Sixth Amendment guarantees all criminal defendants, state and federal, the right "to be confronted with the witnesses against" them. U.S. Const. amend. VI; *Pointer v. Texas,* 380 U.S. 400, 406, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (applying federal Sixth Amendment to the states). As an initial matter, we do not find it necessary in this case to interpret the Confrontation Clause of our state constitution, *see* N.M. Const. art. II, § 14, any more broadly than the federal Confrontation Clause. As in *State v. Toney,* 2002–NMSC–003, ¶ 8, 131 N.M. 558, 40 P.3d 1002, we limit the following discussion to an analysis under the federal Confrontation Clause.

## A

■ {7} Before turning to the merits of Defendant's Sixth Amendment claim, we first consider whether, as the State has contended in supplemental briefing, Defendant by his wrongdoing forfeited his right to confrontation. Defendant's trial was originally scheduled for December 9, 1993. At that time, Perches had pleaded guilty to several charges and was serving his prison sentence. The State subpoenaed Perches to be a witness against Defendant. However, Defendant failed to show up for his trial and a bench warrant was issued. Defendant was a fugitive for over seven years before personally notifying the district court and the district attorney, in July 2000, that he was incarcerated in Arizona on federal charges and wished to have his New Mexico case resolved. Perches had been deported to Mexico the previous month and was unavailable to testify at Defendant's trial. At Defendant's trial on November 27, 2000, the district court admitted into evidence Perches' previous statements to the police. Based on these

facts, the State argues Defendant forfeited his right to confrontation by his wrongful act of absconding.

{8} The United States Supreme Court has long held a Defendant's right to confrontation may be forfeited by his own wrongdoing. *See Reynolds v. United States,* 98 U.S. 145, 158, 25 L.Ed. 244 (1878). The rationale underlying such a rule of forfeiture is "the law [will not] allow a person to take advantage of his own wrong." *United States v. Mastrangelo,* 693 F.2d 269, 272 (2d Cir.1982) (quotation marks and quoted authority omitted); *see also United States v. Cherry,* 217 F.3d 811, 815 (10th Cir.2000) ("'To permit the defendant to profit from [wrongful] conduct would be contrary to public policy, common sense and the underlying purpose of the confrontation clause.'") (quotation marks and quoted authority omitted). As the Second Circuit Court of Appeals stated in *Mastrangelo:*

> [I]f a witness' silence is procured by the defendant himself, whether by chicanery, by threats, or by actual violence or murder, the defendant cannot then assert his confrontation clause rights in order to prevent prior grand jury testimony of that witness from being admitted against him. Any other result would mock the very system of justice the confrontation clause was designed to protect.

693 F.2d at 272–73 (internal citations omitted).

■ {9} For these reasons, the Federal Rules of Evidence were amended in 1997 to include Rule 804(b)(6), which permits the introduction of otherwise inadmissible hearsay when the "statement [is] offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." Rule 804(b)(6) "was intended to codify the waiver-by-misconduct rule as it was applied by the courts at that time." *United States v. Dhinsa,* 243 F.3d 635, 653 (2d Cir.2001). The Tenth Circuit Court of Appeals has thus applied Rule 804(b)(6) in determining when a criminal defendant is estopped by his or her wrongdoing from objecting to the admission of certain hearsay

statements on Confrontation Clause grounds. *See Cherry*, 217 F.3d at 816 (reading Rule 804(b)(6) "to permit the admission of those hearsay statements that would be admissible under the *constitutional* doctrine of waiver by misconduct") (emphasis added). We recognize Rule 804(b)(6) is a federal rule of evidence that has not been adopted into our rules of evidence; however, we are bound to apply federal law in determining the minimum level of a criminal defendant's constitutional right to confrontation. *State v. Javier M.*, 2001–NMSC–030, ¶ 24, 131 N.M. 1, 33 P.3d 1. Consistent with *Cherry*, we rely on the terms of Rule 804(B)(6) in determining whether Defendant has forfeited his federal right to confrontation by absconding and remaining a fugitive for seven years.

■ {10} The burden is on the State to show by a preponderance of the evidence that Defendant forfeited his right to confrontation by his misconduct. *Dhinsa*, 243 F.3d at 653; *see also* Fed.R.Evid. 804(b)(6) advisory committee's note ("The usual Rule 104(a) preponderance of the evidence standards has been adopted in light of the behavior the new Rule 804(b)(6) was designed to discourage."). The elements that must be shown for Rule 804(b)(6) to apply are: (1) the declarant was expected to be a witness; (2) the declarant became unavailable; (3) the defendant's misconduct caused the unavailability of the declarant; and (4) the defendant intended by his misconduct to prevent the declarant from testifying. *See generally* Fed.R.Evid. 804(b)(6) (including forfeiture by wrongdoing as an exception to the hearsay rule when the defendant is unavailable); *see also* James F. Flanagan, *Forfeiture By Wrongdoing and Those Who Acquiesce in Witness Intimidation: A Reach Exceeding Its Grasp and Other Problems with Federal Rule of Evidence 804(b)(6)*, 51 Drake L.Rev. 459, 479–87 (2003).

{11} The State clearly established the first element. The record shows Perches was subpoenaed to be a witness against Defendant at his original trial in 1993. The parties dispute each of the remaining elements. As for the second element of Rule 804(b)(6)— which is the unavailability of the declarant— Defendant argues the State failed to show

Perches was deported before being notified by Defendant that he was incarcerated. According to Defendant, the State could have attempted to either schedule a trial date before Perches was deported or prevent the deportation of Perches until after Defendant's trial. Furthermore, Defendant argues that even if the State did not receive the notice from Defendant prior to Perches' deportation, the State still failed to show it made a reasonable effort to locate Perches. It is unclear from the record how aggressively the State attempted to locate Perches; however, we do note that any efforts by the State may have been futile. *See United States v. Theresius Filippi*, 918 F.2d 244, 246 n. 2 (1st Cir.1990) ("The United States has no subpoena power over a foreign national in a foreign country."). We assume for the purposes of this analysis that Perches was unavailable to testify at Defendant's trial.

{12} We now address the third element of Rule 804(b)(6), which is whether the defendant's misconduct caused the declarant's unavailability. The State argues Defendant's act of absconding and remaining a fugitive for seven years caused Perches' unavailability. The State's argument is based on the fact that if Defendant had not absconded, Perches would have been available to testify at Defendant's trial in 1993. We construe causation in light of the language used in the federal rule, that the defendant committed "wrongdoing that was intended to, and did, *procure* the unavailability of the declarant as a witness." Fed.R.Evid. 804(b)(6) (emphasis added). Defendant's absconding did not in any way "procure" Perches' deportation to Mexico. Although that deportation may, in some indirect and attenuated sense, have been a consequence of Defendant having absconded, that is not a sufficient causal relationship to satisfy the rule.

■ {13} The final element the State must show is that Defendant intended by his act of absconding to procure Perches' unavailability. The State "need not ... show that [Defendant's] sole motivation was to procure the declarant's absence; rather, it need only show that the defendant 'was motivated *in part* by a desire to silence the witness.'" *Dhinsa*, 243 F.3d at 654 (quoting *United*

*States v. Houlihan,* 92 F.3d 1271, 1279 (1st Cir.1996)). In this case, the State failed to show Defendant absconded with the specific intent of preventing Perches from testifying. It may be sufficient to infer under certain facts that a defendant intended by his misconduct to prevent the witness from testifying. For example, we may be able to infer a criminal defendant's murder of a key prosecution witness was intended to prevent the witness from testifying at the defendant's trial. Under the facts of this case, what little the record reveals, we have no basis to infer anything about Defendant's motive in absconding and remaining a fugitive, other than the self-evident fact that he fled from the likely consequences of a successful criminal prosecution.

■ {14} One of the primary purposes of the forfeiture by wrongdoing rule is "to deter criminals from intimidating or 'taking care of' potential witnesses." *United States v. Thompson,* 286 F.3d 950, 962 (7th Cir.2002). Without a showing that Defendant intentionally prevented Perches from being a witness against him, this purpose is not served by admitting the testimony. Under these circumstances, we hold the State has not established that Defendant forfeited his right to confrontation. We now turn to the merits of Defendant's constitutional claim.

**B**

■ {15} The Confrontation Clause of the Sixth Amendment was first interpreted by the United States Supreme Court "to prevent depositions or ex parte affidavits ... [from] being used against the prisoner in lieu of a personal examination and cross-examination of the witness." *Mattox v. United States,* 156 U.S. 237, 242, 15 S.Ct. 337, 39 L.Ed. 409 (1895). The *Mattox* Court recognized that a defendant's general right of confrontation is not absolute and must at times surrender to other considerations of public policy and necessity. *Id.* at 243, 15 S.Ct. 337. Otherwise, the Confrontation Clause "would abrogate virtually every hearsay exception, a result long rejected as unintended and too extreme." *Ohio v. Roberts,* 448 U.S. 56, 63, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *accord Idaho v. Wright,* 497 U.S.

805, 814, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). The overlap between the Confrontation Clause and hearsay rules, however, has never been held to be complete. *See California v. Green,* 399 U.S. 149, 155–56, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

{16} Recognizing that the Confrontation Clause may be violated even when an out-of-court statement falls within a proper hearsay exception, the Supreme Court in *Roberts* developed a general approach for determining whether admissible hearsay evidence is indeed a violation of the Confrontation Clause. First, a rule of necessity required the prosecution to "either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Roberts,* 448 U.S. at 65, 100 S.Ct. 2531. Second, after a witness was shown to be unavailable, the trial court considered whether the statement possessed adequate "indicia of reliability." *Id.* at 65–66, 100 S.Ct. 2531. A hearsay statement was deemed sufficiently reliable to satisfy the Confrontation Clause when (1) the evidence fell within a "firmly rooted hearsay exception" or (2) the statement possessed "particularized guarantees of trustworthiness." *Id.* at 66, 100 S.Ct. 2531.

{17} In prior cases, we have evaluated our hearsay exception for statements against penal interest within this framework. Rule 11–804(B)(3) provides that a statement is not excluded by the hearsay rule if (1) the declarant is unavailable as a witness and (2) the statement "at the time of its making ... so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." In *State v. Torres,* 1998–NMSC–052, ¶ 30, 126 N.M. 477, 971 P.2d 1267, we held this exception "is a firmly rooted exception to the hearsay rule and poses an insignificant risk of unreliability under the Confrontation Clause." Our holding was based on the " 'exception's historical longevity and widespread acceptance,' " *id.* (quoting *State v. Ross,* 1996–NMSC–031, 122 N.M. 15, 24, 919 P.2d 1080, 1089), and our belief at the time that Rule 11–804(B)(3) was "narrowly tailored in such a way as to limit admissibility

to statements bearing adequate indicia of reliability." *Id.*

{18} Shortly after we issued our opinion in *Torres,* the United States Supreme Court's opinion in *Lilly v. Virginia,* 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) forced us to reconsider our holding in *Torres.* In *Lilly,* the Supreme Court specifically addressed the application of the federal Confrontation Clause to Virginia's statement-against-penal-interest exception. A plurality of the Supreme Court held "accomplices' confessions that inculpate a criminal defendant are *not* within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." *Id.* at 134, 119 S.Ct. 1887 (Stevens, J., plurality) (emphasis added). Although the *Lilly* plurality left open the possibility such statements might be admitted if the prosecution can show they contain "particularized guarantees of trustworthiness," as a general matter, such a showing would be possible only in the most exceptional of cases. *Id.* at 136, 119 S.Ct. 1887. The Court said:

> It is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted ... when the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing.

*Id.* at 137, 119 S.Ct. 1887.

{19} The Supreme Court's splintered opinion in *Lilly* generated much scholarly discourse and debate on the constitutionality of state hearsay rules admitting statements against penal interest, *see, e.g.,* Sarah D. Heisler, *My Brother, My Witness Against Me: The Constitutionality of the "Against Penal Interest" Hearsay Exception in Confrontation Clause Analysis,* 90 J.Crim. L. & Criminology 827 (2000), as well as created confusion in state and federal courts on the admissibility of such statements, *see generally* Roger W. Kirst, *Appellate Court Answers to the Confrontation Questions in Lilly v. Virginia,* 53 Syracuse L.Rev. 87 (2003). Following *Lilly,* we continued to adhere to our holding in *Torres* that our statement-against-penal-interest exception was "firmly rooted"

and thus any evidence properly admitted under Rule 11–804(B)(3) would survive constitutional scrutiny. *See State v. Desnoyers,* 2002–NMSC–031, ¶ 10, 132 N.M. 756, 55 P.3d 968; *State v. Reyes,* 2002–NMSC–024, ¶ 40, 132 N.M. 576, 52 P.3d 948; *State v. Martinez–Rodriguez,* 2001–NMSC–029, ¶ 27, 131 N.M. 47, 33 P.3d 267; *State v. Gonzales,* 1999–NMSC–033, ¶ 19, 128 N.M. 44, 989 P.2d 419.

{20} Recently, in *Crawford,* 541 U.S. at ——, 124 S.Ct. at 1371, the United States Supreme Court described the *Roberts* framework as "so unpredictable that it fails to provide meaningful protection from even core confrontation violations." In *Crawford,* the defendant had stabbed a man who allegedly tried to rape his wife. *Id.* at 1357. At trial, the defendant asserted self-defense, based on his belief the victim had drawn a weapon before the defendant assaulted him. *Id.* The defendant's wife gave a statement to the police that cast doubt upon the self-defense claim; the wife's statement indicated the victim reached for something only after he had been stabbed by the defendant. *Id.* The defendant's wife did not testify at the trial because of the state law marital privilege. *Id.* The state law privilege did not extend "to a spouse's out-of-court statements admissible under a hearsay exception." *Id.* at 1358. Therefore, the trial court allowed the government to introduce the wife's tape-recorded statements to the police as evidence the stabbing was not in self-defense on the basis the statement bore "particularized guarantees of trustworthiness." *Id.* at 1358. On appeal, the Washington Supreme Court affirmed. *Id.* at 1358.

{21} The United States Supreme Court granted certiorari to determine whether admission of the statement violated the federal Confrontation Clause. *Id.* at 1359. The Court distilled two fundamental principles from the history of the Confrontation Clause. "First, the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Id.* at 1363. The Court determined the Confrontation Clause was primarily concerned with "testi-

monial" hearsay, which, although not clearly defined in the opinion, includes "interrogations by law enforcement officers." *Id.* at 1365. Second, "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.*

{22} Although, the Court believed the results of its prior Confrontation Clause decisions reflected those principles, the Court concluded its rationales did not. *Id.* at 1369. Specifically, the *Roberts* test departed from those two principles because the test was both too broad and too narrow. It was too broad because it applied "the same mode of analysis whether or not the hearsay consists of *ex parte* testimony." *Id.* It was too narrow because "[i]t admits statements that *do* consist of *ex parte* testimony upon a mere finding of reliability." *Id.* The Court noted that while the Confrontation Clause's "ultimate goal is to ensure reliability of evidence," the Clause demands "reliability be assessed in a particular manner: by testing in the crucible of cross examination." *Id.* at 1370. The Court held:

> Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of "testimonial." Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed.

*Id.* at 1374 (footnote omitted). Applying this test to the facts of *Crawford*, the Court held the defendant made out a violation of the Sixth Amendment and reversed the judgment of the Washington Supreme Court. *Id.*

{23} As a result of the Supreme Court's Confrontation Clause analysis as set forth in *Crawford*, we must overrule *Torres* to the extent we held custodial confessions implicating the accused fall within a firmly rooted hearsay exception and do not violate the federal Confrontation Clause. *See Torres*, 1998–NMSC–052, ¶ 32, 126 N.M. 477, 971 P.2d 1267. We note, however, that *Crawford* may not be applicable to statements made to friends or acquaintances that satisfy our Rule 11–804(B)(3) analysis. *Crawford*, 541 U.S. at ——, 124 S.Ct. at 1364 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."). Nevertheless, we need not address in this case the continued vitality of our Confrontation Clause opinions regarding statements against penal interest made to codefendants, friends, family, or acquaintances. *See, e.g., Gonzales*, 1999–NMSC–033, ¶ 34, 128 N.M. 44, 989 P.2d 419 (distinguishing a statement made to an acquaintance from one given to the police).

{24} Seen through the newly shaped lens of *Crawford*, the State has conceded the district court erred in admitting Perches' statements in Defendant's trial. The statements were made during custodial interrogation. The *Crawford* rule is then applicable because the statements were "testimonial." *See Crawford*, 541 U.S. at ——, 124 S.Ct. at 1374. It is clear from the facts that Defendant had no opportunity to cross-examine Perches at a preliminary hearing, grand jury proceeding, or otherwise on these testimonial statements. Therefore, Defendant's Sixth Amendment right to confrontation was violated by the admission of these statements into evidence at his trial.

## C

{25} Finally, we must determine the appropriate remedy for this constitutional error. The State argues reversal of Defendant's convictions is unnecessary because any error in the admission of Perches' statements was harmless. Whether the violation of a federal constitutional right is harmless is

a federal question. *Chapman v. California*, 386 U.S. 18, 21, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Under federal law, the burden is on the State to establish that the constitutional error in this case was "harmless beyond a reasonable doubt." *Brecht v. Abrahamson*, 507 U.S. 619, 630, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Federal constitutional error cannot be deemed harmless if " 'there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " *Chapman*, 386 U.S. at 24, 87 S.Ct. 824 (quoting *Fahy v. Conn.*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963)); *accord State v. Padilla*, 2002–NMSC–016, ¶ 22, 132 N.M. 247, 46 P.3d 1247.

{26} At times, the United States Supreme Court may have used language in its opinions suggesting that constitutional error was harmless whenever the properly admitted evidence at trial provided overwhelming support for a determination of guilt. *See, e.g., United States v. Hasting*, 461 U.S. 499, 510–12, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). We believe "the way we phrase the governing [harmless error] standard is far less important than the quality of the judgment with which it is applied." *Brecht*, 507 U.S. at 643, 113 S.Ct. 1710 (Stevens, J., concurring). Nevertheless, we take the opportunity provided by the facts of this case to review the role that overwhelming evidence of a defendant's guilt plays in an analysis of federal constitutional harmless error.

{27} First, criminal defendants have a constitutional right to have a jury decide guilt or innocence, not appellate court judges during review on appeal. As Justice Frankfurter stated almost sixty years ago, "it is not to be supposed that Congress intended to substitute the belief of appellate judges in the guilt of an accused, however justifiably engendered by the dead record, for the ascertainment of guilt by a jury under appropriate judicial guidance, however cumbersome that process may be." *Bollenbach v. United States*, 326 U.S. 607, 615, 66 S.Ct. 402, 90 L.Ed. 350 (1946). This point was recently reiterated by the Supreme Court in *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). In that case, the Court held that an erroneous jury instruction on the definition of reasonable doubt is a structural error that is not subject to harmless error review. *Id.* at 281, 113 S.Ct. 2078. Although the Court did not conduct a harmless error analysis in *Sullivan*, the Court nonetheless took the opportunity to explain *Chapman*:

> Consistent with the jury-trial guarantee, the question [*Chapman* ] instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand. Harmless-error review looks, we have said, to the basis on which the jury *actually rested* its verdict. The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be— would violate the jury-trial guarantee.

*Id.* at 279, 113 S.Ct. 2078 (quotation marks and quoted authority omitted).

{28} In *Neder v. United States*, 527 U.S. 1, 15, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), the Supreme Court refused "to extend the reasoning in *Sullivan* from a defective 'reasonable doubt' instruction to a failure to instruct on an element of the crime." However, the *Neder* Court did not indicate disapproval with the *Sullivan* Court's explanation of the *Chapman* harmless error analysis. In fact, the Court had "no hesitation" in reaffirming its decision in *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). *Neder*, 527 U.S. at 17, 119 S.Ct. 1827 n. 2. In *Rose*, the Court noted that a trial court judge cannot direct a verdict of guilty against the defendant "regardless of how overwhelmingly the evidence may point in that direction." 478 U.S. at 578, 106 S.Ct. 3101 (quoting *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 572–73, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977)). To do so would be a violation of the defendant's Sixth Amendment right to a jury trial. *See id.* In

conducting a harmless error review, we believe the appellate court must be similarly conscious of its limitations. In conducting a review for harmlessness of a constitutional error, we need to be conscious of the burden on the State, as well as the particular significance the admission or exclusion of evidence had in the trial that occurred. Otherwise, as when the district court directs a verdict of guilty, "the wrong entity [will have] judged the defendant guilty." *Id.*

{29} Aside from invading the province of the jury, appellate courts are "poorly equipped" to determine guilt or innocence, which "counsels against the practice of focusing solely on the question of factual guilt." Harry T. Edwards, *To Err is Human, But Not Always Harmless: When Should Legal Error Be Tolerated?*, 70 N.Y.U. L.Rev. 1167, 1193–94 (1995). In one sense, appellate courts have traditionally deferred to the factual determinations of juries because the trial record often fails to provide a complete picture of the evidence. The jury had the opportunity to observe firsthand the testimony and evidence presented at trial, which places them "in a much better position than appellate judges to assess the facts." Gregory Mitchell, *Against "Overwhelming" Appellate Activism: Constraining Harmless Error Review*, 82 Calif. L.Rev. 1335, 1353 (1994). In another sense, the record contains too much information for the appellate court to independently determine guilt, because the court often possesses knowledge, provided by inadmissible evidence, which may be very probative of guilt but inappropriate to consider. *Id.* at 1354.

{30} Furthermore, if we were to focus our harmless error analysis exclusively on whether the trial record consisted of overwhelming evidence of the defendant's guilt, we risk inadvertently concluding that constitutional error was harmless simply because there was substantial evidence to support the conviction. *See, e.g., State v. Lopez*, 2000–NMSC–003, ¶ 21, 128 N.M. 410, 993 P.2d 727 (holding a constitutional error harmless because there was substantial evidence to support the verdict). When reviewing a conviction for substantial evidence, "[t]he relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Garcia*, 114 N.M. 269, 274, 837 P.2d 862, 867 (1992) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). The evidence is viewed "in the light most favorable to the verdict, resolving all conflicts and indulging all permissible inferences to uphold the conviction, and disregarding all evidence and inferences to the contrary." *State v. Perea*, 2001–NMSC–026, ¶ 5, 130 N.M. 732, 31 P.3d 1006. The jury verdict should not automatically be afforded deference when a constitutional error has infected the trial. Rather, in a proper harmless error analysis, the appellate court defers to the jury verdict *only* when the State has established beyond a reasonable doubt that the jury verdict was not tainted by the constitutional error.

{31} Last, but certainly not least, when we hold errors harmless based solely on our assessment of the defendant's guilt, we run the danger of undermining some of our most important legal principles. "[O]ur Constitution, and our criminal justice system, protect other values besides the reliability of the guilt or innocence determination." *Rose*, 478 U.S. at 588, 106 S.Ct. 3101 (Stevens, J., concurring). These values are not adequately protected by a harmless error analysis that focuses solely on whether there is overwhelming evidence of a defendant's guilt, because that test "ignores the argument that, even if conviction *appears* inevitable, there is a point at which an error becomes too great to condone as a matter of constitutional integrity and prosecutorial deterrence." Mitchell, *supra*, at 1366; *cf. State v. Barber*, 2004–NMSC–019, ¶ 18, 135 N.M. 621, 92 P.3d 633 (stating fundamental error may be premised on "a mistake in the process [that] makes a conviction fundamentally unfair notwithstanding the apparent guilt of the accused").

{32} For the above reasons, we conclude that constitutional error cannot be deemed harmless simply because there is overwhelming evidence of the defendant's guilt. Our focus must remain squarely on

assessing the likely impact of the error on the jury's verdict. However, this does not mean that evidence of the defendant's guilt is irrelevant to the analysis. The strength of the properly admitted evidence is a factor in evaluating the likely impact on the jury of the constitutional error. *See Neder*, 527 U.S. at 17, 119 S.Ct. 1827 (holding that where an erroneously omitted element is both uncontested and supported by overwhelming evidence, such error is harmless beyond a reasonable doubt); *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (listing "the overall strength of the prosecution's case" as one factor in the harmless error analysis). As for whether the admission of an accomplice statement in violation of a defendant's right of confrontation is harmless, the Supreme Court specifically stated in *Schneble v. Florida*, 405 U.S. 427, 430, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972) that "the properly admitted evidence of guilt [may be] so overwhelming, and the prejudicial effect of the codefendant's admission [may be] so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error."

{33} Before turning to whether the constitutional error in this case is harmless, we believe it is appropriate to address the concern that we are overruling numerous New Mexico cases. *See* Dissenting Op. ¶ 62. We read the cases cited by the dissent somewhat differently. We do not understand them to hold that overwhelming evidence of the defendant's guilt automatically renders constitutional error harmless. In most of the cases, the strength of the prosecutor's case was considered but was not determinative. *See, e.g., State v. Herrera*, 102 N.M. 254, 258, 694 P.2d 510, 514 (1985) (noting that the erroneous admission of evidence "contributed little, if anything, to the conviction"). At any rate, even if one or more of those opinions are in conflict with the constitutional harmless error analysis we describe today, *see, e.g., State v. Roybal*, 107 N.M. 309, 312, 756 P.2d 1204, 1207 (Ct.App.1988) (stating in dicta that "[w]here the record contains other properly admitted and overwhelming evidence that independently establishes defendant's guilt, admission of the challenged evidence is harmless error"), those opinions

would be inconsistent with the federal law we are bound to apply in this case.

{34} We now consider whether the State has met its burden of establishing that there is no reasonable possibility that the admission of Perches' statements contributed to Defendant's convictions. Perches' statements implicated Defendant for aggravated burglary, conspiracy to commit burglary, and two counts of larceny. In *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), the United States Supreme Court was faced with determining whether a criminal defendant's involuntary confession, which was unconstitutionally admitted into evidence against him at his trial, contributed to his conviction. In that case, the Court noted:

> [C]onfessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so....[A] full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision....[T]he risk that the confession is unreliable, coupled with the profound impact that the confession has upon the jury, requires a reviewing court to exercise extreme caution before determining that the admission of the confession at trial was harmless.

*Id.* at 296, 111 S.Ct. 1246. We believe similar caution must be exercised before determining that the erroneous admission of an accomplice's confession that implicates the defendant is harmless. Like a defendant's own confession, the incriminating statements of an accomplice often have a profound impact on the jury's verdict.

{35} Toward the beginning of the interrogation, Perches stated that Defendant planned a burglary and "wanted to burglarize a house." These statements provided the only direct evidence of an agreement between Defendant and Perches to burglarize the house, thus we cannot say there is no reasonable possibility these statements did not contribute to Defendant's conviction for conspiracy to commit burglary. Perches also stated that Defendant got out of the car with

a tire tool, broke the window, and went into the house. This statement placed a weapon in Defendant's hands and described how he gained entry into the residence. Again, we cannot say there is no reasonable possibility this statement did not contribute to Defendant's conviction for aggravated burglary, especially since it was the only evidence presented at trial showing Defendant was armed at the time of burglary. Defendant was convicted of aggravated burglary based on his use of the tire iron to break into the victim's house. The next set of Perches' statements concerned the items Perches intended to take from the victim's home and those Defendant intended to take. Perches claimed he only wanted to take a VCR and tennis shoes, but Defendant broke into the gun cabinet and intended to take firearms. Because this was the clearest evidence of the defendant's intent to commit larceny, we cannot conclude beyond a reasonable doubt these statements did not contribute to the defendant's two larceny convictions.

{36} In short, the properly admitted evidence at trial only established Defendant's presence near the victim's house at approximately the same time Perches was caught leaving the house. While there may have been sufficient evidence aside from Perches' statements to support each of Defendant's convictions, we nonetheless believe those statements that were admitted against Defendant in violation of his federal right to confrontation likely contributed to each of Defendant's convictions. Defendant's convictions for aggravated burglary, conspiracy to commit burglary, larceny over $250, and larceny of a firearm are reversed.

### III

■ {37} The second issue we address is whether Defendant's convictions for both larceny over $250 and larceny of a firearm violated his right not to be placed in double jeopardy. We reversed both of Defendant's larceny convictions on Confrontation Clause grounds but address this issue to provide guidance to the district court if the issue arises again on remand. *See Hinkle, Cox, Eaton, Coffield & Hensley v. Cadle Co.*, 115 N.M. 152, 158, 848 P.2d 1079, 1085 (1993).

Defendant was convicted of larceny over $250 (and under $2500) based on the VCR and shoes found in the victim's hallway. He was also convicted of larceny of a firearm under $2,500 based on the rifles and shotguns found piled in the same hallway. Each of these two counts of larceny are fourth-degree felonies. *See* § 30–16–1.

■ {38} The Fifth Amendment of the United States Constitution, made applicable to the states by the Fourteenth Amendment Due Process Clause, *see Benton v. Maryland*, 395 U.S. 784, 786, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), and Article II, Section 15 of the New Mexico Constitution each protect defendants against multiple punishments for the same offense. *Illinois v. Vitale*, 447 U.S. 410, 415, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980); *State v. Pierce*, 110 N.M. 76, 84, 792 P.2d 408, 416 (1990). Whether a defendant has been unconstitutionally subjected to multiple punishments is a matter of law, which we review de novo. *State v. Mora*, 2003–NMCA–072, ¶ 16, 133 N.M. 746, 69 P.3d 256. Two different types of multiple punishment cases exist. *See Swafford v. State*, 112 N.M. 3, 8, 810 P.2d 1223, 1228 (1991). In "unit-of-prosecution" cases, "the accused is charged with multiple violations of a single statute, committed against either single or multiple victims, based on what may or may not be deemed a single course of conduct." *State v. Barr*, 1999–NMCA–081, ¶ 11, 127 N.M. 504, 984 P.2d 185. Alternatively, "double-description cases" deal with "violations of multiple statutes that may or may not be deemed the same offense for double jeopardy purposes." *Swafford*, 112 N.M. at 8, 810 P.2d at 1228. While the analysis for each type of case focuses on whether the Legislature intended multiple punishments, *see id.*, the particular canons of construction we apply in ascertaining the Legislature's intent depend on the specific type of multiple punishment case in front of us.

{39} The general larceny statute, Section 30–16–1, at issue provides:

> Larceny consists of the stealing of anything of value which belongs to another.
>
> Whoever commits larceny when the value of the property stolen is one hundred

dollars ($100) or less is guilty of a petty misdemeanor.

Whoever commits larceny when the value of the property stolen is over one hundred dollars ($100) but not more than two hundred fifty dollars ($250) is guilty of a misdemeanor.

Whoever commits larceny when the value of the property stolen is over two hundred fifty dollars ($250) but not more than two thousand five hundred dollars ($2,500) is guilty of a fourth degree felony.

Whoever commits larceny when the value of the property stolen is over two thousand five hundred dollars ($2,500) but not more than twenty thousand dollars ($20,000) is guilty of a third degree felony.

Whoever commits larceny when the value of the property stolen is over twenty thousand dollars ($20,000) is guilty of a second degree felony.

Whoever commits larceny when the property of the value stolen is livestock is guilty of a third degree felony regardless of its value.

Whoever commits larceny when the property of value stolen is a firearm is guilty of a fourth degree felony when its value is less than two thousand five hundred dollars ($2,500).

Section 30–16–1 defines the offense of larceny and sets the level of punishment based generally on the value and, in specific instances, the nature of the items taken.

{40} Since both of Defendant's larceny convictions are based on violations of a single statute, Section 30–16–1, we view this as a unit-of-prosecution case. "The relevant inquiry in [unit-of-prosecution] cases is whether the [L]egislature intended punishment for the entire course of conduct or for each discrete act." *Swafford*, 112 N.M. at 8, 810 P.2d at 1228. If the statute clearly creates two separate offenses, then "we must follow the statute." *State v. Morro*, 1999–NMCA–118, ¶ 9, 127 N.M. 763, 987 P.2d 420. If the Legislature's intent is unclear, we presume "the [L]egislature did not intend to fragment a course of conduct into separate offenses." *Swafford*, 112 N.M. at 8, 810 P.2d at 1228. We indulge in this "rule of lenity" because "criminal statutes should be inter-

preted in the defendant's favor when insurmountable ambiguity persists regarding the intended scope of a criminal statute." *State v. Ogden*, 118 N.M. 234, 242, 880 P.2d 845, 853 (1994).

{41} In applying these principles to the larceny statute, we believe the statute explicitly provides for separate punishments for three separate categories of property. One unit of prosecution exists for larceny of "generic" property, with gradations of punishment based on the monetary value of the property, all of which are placed in the first part of the statute. Separate units of prosecution exist for the larceny of two "specific" types of property, each appearing at the end of the list of offenses within the first unit. If the specific property stolen is livestock, then under Section 30–16–1, the defendant may be found guilty of a third-degree felony, regardless of the livestock's value. Likewise, under Section 30–16–1, if the specific property stolen is a firearm valued at less than $2,500, then the defendant may be convicted of a fourth-degree felony. We believe under the structure of the statute, where the property stolen includes both generic property and a firearm, larceny of the firearm is punishable as a separate offense. While Section 30–16–1 could certainly have been clearer, *see, e.g.* NMSA 1978, § 30–16–8 (1995) ("Each separate incident of embezzlement or conversion constitutes a separate and distinct offense."), we do not believe there is "insurmountable ambiguity" so as to trigger the rule of lenity. *See Ogden*, 118 N.M. at 242, 880 P.2d at 853.

{42} Our construction of Section 30–16–1 is also justified on policy grounds. In *Swafford*, 112 N.M. at 14, 810 P.2d at 1234, we stated that "[s]tatutes directed toward protecting different social norms and achieving different policies can be viewed as separate and amenable to multiple punishments." While that assertion is not a rule of law, but instead a "guiding ... principle[ ] for divining legislative intent," *id.*, we note the firearms provision of the statute addresses different social concerns and reflects different policies than the general larceny provisions. The Legislature likely intended to discourage the larceny of firearms for a number of obvious safety reasons. *See State v. Luna*, 99

N.M. 76, 78, 653 P.2d 1222, 1224 (Ct.App. 1982) ("Crimes involving violence or the use of firearms are among those most abhorrent to our society."). We believe the structure of Section 30-16-1 indicates the Legislature considered the larceny of firearms to be so serious it warranted a separate punishment; therefore, the Legislature created a separate offense within the general larceny statute for the unlawful taking of a firearm valued at less than $2,500.

{43} Defendant urges us to apply the single-larceny doctrine, which provides that "[w]hen several articles of property are stolen by the defendant from the same owner at the same time and at the same place, only one larceny is committed." *State v. Rowell*, 121 N.M. 111, 116, 908 P.2d 1379, 1384 (1995) (quoted authority omitted). Although the single-larceny doctrine has been adopted and applied in many different ways in a number of other jurisdictions, *see, e.g., State v. White*, 348 Md. 179, 702 A.2d 1263 (1997), the doctrine is a canon of construction used when the Legislature's intent regarding multiple punishments is ambiguous. The single-larceny doctrine is inapplicable in this case because the Legislature has made its intent clear.

{44} If the State, on retrial, can prove Defendant intended to take a VCR, shoes, and firearms, Defendant may receive multiple punishments. Under the circumstances, Defendant's constitutional right to be free from double jeopardy would not be violated, if he were convicted of larceny over $250 and larceny of a firearm under $2,500. We note that if we have misstated the Legislature's intent regarding the scope of Section 30-16-1, the Legislature certainly has the power to amend the statute. *Cf. Rowell*, 121 N.M. at 118, 908 P.2d at 1386 (noting that Section 30-16-8 was specifically amended by the Legislature to make each separate incident of embezzlement a separate offense in response to our holding to the contrary in *State v. Brooks*, 117 N.M. 751, 755, 877 P.2d 557, 561 (1994)).

## IV

{45} We reverse each of Defendant's convictions because admission into evidence of the testimonial statements of a non-testifying accomplice violated his federal constitutional right to confrontation. Defendant's case is remanded to the district court for proceedings consistent with this opinion.

{46} **IT IS SO ORDERED.**

WE CONCUR: PETRA JIMENEZ MAES, Chief Justice, RICHARD C. BOSSON, and EDWARD L. CHÁVEZ, Justices.

PATRICIO M. SERNA, Justice (concurring in part, dissenting in part).

SERNA, Justice (concurring in part, dissenting in part).

{47} I concur with the majority's conclusion that the admission of Perches' statement violates the Confrontation Clause based on the analysis of the United States Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). I also agree with the majority's limited overruling of *State v. Torres*, 1998-NMSC-052, ¶¶ 30-32, 126 N.M. 477, 971 P.2d 1267, as well as the observation that *Crawford* does not undermine our other precedent dealing with statements against penal interest made outside the context of a custodial interrogation. *See, e.g., State v. Reyes*, 2002-NMSC-024, ¶¶ 34-40, 132 N.M. 576, 52 P.3d 948; *State v. Toney*, 2002-NMSC-003, ¶¶ 3-12, 131 N.M. 558, 40 P.3d 1002; *State v. Martinez-Rodriguez*, 2001-NMSC-029, ¶¶ 21-27, 131 N.M. 47, 33 P.3d 267; *State v. Gonzales*, 1999-NMSC-033, ¶¶ 15-20, 32-40, 128 N.M. 44, 989 P.2d 419. In fact, even before the Supreme Court decided *Crawford*, we emphasized that the distinction between a "statement to an acquaintance in a casual conversation rather than to the police during a custodial interrogation" is critical for Confrontation Clause purposes. *Toney*, 2002-NMSC-003, ¶ 12, 131 N.M. 558, 40 P.3d 1002. Whereas *Crawford* does not conflict with our cases that have allowed the admission of statements made to acquaintances and cellmates, it does raise questions about other cases involving non-testimonial statements. For example, certain non-testimonial statements that we have previously held to violate the Confrontation Clause might now be ad-

missible consistent with the Constitution even without cross-examination. *See State v. Ross,* 1996–NMSC–031, 122 N.M. 15, 26, 919 P.2d 1080, 1091 (concluding that a statement made by the victim to her boyfriend that the defendant was holding her hostage, although admissible under the Rules of Evidence as a statement of recent perception, lacked particularized guarantees of trustworthiness as required by *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)); *State v. Austin,* 104 N.M. 573, 574–76, 725 P.2d 252, 253–55 (Ct.App.1985) (concluding that computerized private business records admitted under the business records exception as evidence of embezzlement violated the Confrontation Clause); *State v. Martinez,* 99 N.M. 48, 51–52, 653 P.2d 879, 882–83 (Ct. App.1982) (holding that the admission of a victim's report of an ongoing crime to a passing police officer violated the Confrontation Clause). The majority in *Crawford,* or at least three of its members, appears to have a clear vision of the Confrontation Clause under which these types of non-testimonial statements could be admitted despite the absence of cross-examination. *See Lilly v. Virginia,* 527 U.S. 116, 142, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (Breyer, J., concurring) ("[T]he current hearsay-based Confrontation Clause test is arguably too broad."); *White v. Illinois,* 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (Thomas, J., joined by Scalia, J., concurring in part and concurring in judgment) ("The federal constitutional right of confrontation extends to any witness who actually testifies at trial, but the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in *formalized* testimonial materials, such as affidavits, depositions, prior testimony, or confessions.") (emphasis added); *id.* at 364, 112 S.Ct. 736 (discussing the Confrontation Clause implications of "a victim who blurts out an accusation to a passing police officer, or the unsuspecting social-services worker who is told of possible child abuse"). *See generally Crawford,* 124 S.Ct. at 1364 ("[N]ot all hearsay implicates the Sixth Amendment's core concerns.").

{48} In addition to my agreement with the application of *Crawford,* I concur with the majority's determination that the admission of Perches' statement is not harmless beyond a reasonable doubt with respect to Defendant's conviction for aggravated burglary and conspiracy. Perches' statement was the only evidence that a tire iron was used to break the window. This statement was critical to the State's case on aggravated burglary, was not cumulative to other evidence, and was not corroborated. As a result, the State has not shown beyond reasonable doubt that a rational jury would have found Defendant guilty of aggravated burglary without this statement. With respect to the conspiracy conviction, "[i]t is not necessary in proving a conspiracy to show ... the making of an express or formal agreement. The formation and existence of a conspiracy may be inferred from all circumstances tending to show the common intent...." UJI 14–2813 NMRA 2004. The circumstantial evidence in this case, which is discussed below in more detail, could lead to a reasonable inference that Defendant and Perches agreed to commit the burglary. Nonetheless, Perches' statement, which was the only direct testimony of an agreement, was of central importance to the State's prosecution on conspiracy and was not insignificant in comparison with the circumstantial evidence supporting an agreement. Thus, there is a reasonable doubt that a jury would not have convicted Defendant of conspiracy without Perches' statement.

{49} As a final point of agreement, I concur with the majority's determination that convictions of both larceny of a firearm valued at less than $2500 and larceny over $250 does not violate the constitutional protection against double jeopardy. I agree with the majority that the Legislature explicitly specified two types of property, firearms and livestock, that are excluded from the general larceny scheme based not on property value but instead on the nature of the property. The Legislature intended to carve out for separate punishment the theft of these two types of property based on a legislative determination that they deserve special protection in this State. *See generally State v. Pacheco,* 81 N.M. 97, 100, 463 P.2d 521, 524 (Ct.App.1969) ("[T]he larceny of livestock statute was apparently enacted to protect the

ownership thereof, to prevent a kind of larceny peculiarly easy of commission and difficult of discovery and punishment, and to protect the important industry of stock raising.").

{50} I respectfully dissent from the majority's adoption of a new standard for harmless error review based on a violation of a federal constitutional right and from the majority's application of this standard to Defendant's larceny convictions. The standard for harmless error in this context is a federal question, and in my view, it exceeds this Court's authority to diverge from clear and binding precedent from the United States Supreme Court. Applying the Supreme Court's standard to the larceny convictions, I conclude that the admission of Perches' statement was harmless error.

{51} "Whether a conviction for crime should stand when a State has failed to accord federal constitutionally guaranteed rights is every bit as much of a federal question as what particular federal constitutional provisions themselves mean, what they guarantee, and whether they have been denied." *Chapman v. California*, 386 U.S. 18, 21, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Therefore, the Supreme Court's pronouncements on harmless error review of federal constitutional errors are binding on this Court. Under the Supreme Court's formulation, there are two types of constitutional errors, structural errors and trial errors. Most constitutional errors fall into the latter class and are subject to a harmless error inquiry, while a very limited class of errors are deemed structural and require automatic reversal because they necessarily render a trial fundamentally unfair. *Neder v. United States*, 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). The erroneous admission of an accomplice's statement implicating the accused is a trial error that is subject to a harmlessness inquiry. *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). For this type of constitutional trial error, there is no dispute that *Chapman* sets forth the appropriate test for harmless error: the State must "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 24, 87

S.Ct. 824. Unfortunately, though, this standard proved sufficiently ambiguous that it produced two seemingly distinct approaches to harmless error.

{52} In a series of cases addressing the error at issue in this case, that is, a Confrontation Clause violation by admitting the out-of-court statement of an accomplice without the opportunity for cross-examination, the Supreme Court, applying the *Chapman* test, held that, "[i]n some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." *Schneble v. Florida*, 405 U.S. 427, 430, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); *accord Brown v. United States*, 411 U.S. 223, 231, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973) ("The testimony erroneously admitted was merely cumulative of other overwhelming and largely uncontroverted evidence properly before the jury."); *Harrington*, 395 U.S. at 254, 89 S.Ct. 1726. By contrast, in the context of a constitutionally-deficient reasonable doubt instruction, the Court stated that "[t]he inquiry ... is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). Because, as the majority recognizes, the Court did not actually apply *Chapman* in *Sullivan* due to the existence of structural error, this dicta would not be sufficient to supplant the Court's previously adopted harmless error standard. Nevertheless, *Sullivan* did raise questions about the proper interpretation of *Chapman*, with a line of cases focusing on the existence of overwhelming evidence of guilt and the effect of the error on a hypothetical rational jury and another case appearing to offer a different interpretation that focused on the effect of an error on the jury's actual deliberations. Even in *Chapman* itself, the Court's rationale appeared to rest on both of these approaches. *Compare* 386 U.S. at 25–26, 87 S.Ct. 824 ("[A]bsent the constitutionally forbidden comments, honest, fair-minded jurors

might very well have brought in not-guilty verdicts."), *with id.* at 26, 87 S.Ct. 824 ("[I]t is completely impossible for us to say that the State has demonstrated, beyond a reasonable doubt, that the [error] did not contribute to petitioner's convictions.").

{53} However, the Supreme Court recently resolved this ambiguity. In *Neder,* the Supreme Court clearly stated that reviewing courts must answer the following question in applying *Chapman:* "Is it clear beyond a reasonable doubt that a *rational jury* would have found the defendant guilty *absent the error?*" *Neder,* 527 U.S. at 18, 119 S.Ct. 1827 (emphases added); *see Mitchell v. Esparza,* 540 U.S. 12, 124 S.Ct. 7, 12, 157 L.Ed.2d 263 (2003) (concluding that an instructional error was harmless because "the jury verdict would surely have been the same had it been instructed" properly). Contrary to the assertion by the majority that *Neder* did not reject *Sullivan's* interpretation of *Chapman,* this articulation of a rational jury standard directly contradicts the effect-on-the-jury language of *Sullivan* quoted and relied upon by the majority and clearly signals a return to the standard applied in *Schneble, Brown,* and *Harrington.* In addition, the Court in *Neder* reiterated the significance of overwhelming evidence of guilt in evaluating harmless error. 527 U.S. at 17, 119 S.Ct. 1827. As a result, "[f]ollowing the Supreme Court's *Neder* decision, the overwhelming evidence standard for harmless error has won a clear, if narrow, victory." Jeffrey O. Cooper, *Searching for Harmlessness: Method and Madness in the Supreme Court's Harmless Constitutional Error Doctrine,* 50 U. Kan. L.Rev. 309, 333 (2002). *Neder* "explicitly rejected the reasoning, if not the result, of *Sullivan.*" *Id.* at 323, 113 S.Ct. 2078. "At present, then, a clear, if narrow, majority of the Court supports the overwhelming evidence standard for harmless error in all cases involving trial error, while four Justices would look to the effect of the error on the jury." *Id.* at 324, 113 S.Ct. 2078. As a federal question, the overwhelming evidence standard of *Neder, Schneble, Brown,* and *Harrington* is binding precedent in this Court's application of the *Chapman* standard.

{54} The majority opinion appears to me to apply the *Sullivan* effect-on-the-jury standard in place of *Neder* and unduly minimizes the effect of overwhelming evidence of guilt. *See* Majority opinion, ¶¶ 27 (quoting *Sullivan* ), 32 ("Our focus must remain squarely on assessing the likely impact of the error on the jury's verdict."). Much like Justice Scalia's dissent, the majority complains that harmless error review focusing on overwhelming evidence of guilt infringes on the right to a jury. *See Neder,* 527 U.S. at 36, 119 S.Ct. 1827 (Scalia, J., concurring in part, dissenting in part) (stating that the Court's opinion "throws open the gate for appellate courts to trample over the jury's function"). The majority also contends that an overwhelming evidence of guilt test undermines a defendant's constitutional rights.

{55} I believe this analysis is inconsistent with *Neder.* The Supreme Court in that case clearly rejected the same criticisms found in the majority opinion.

> A reviewing court making this harmless-error inquiry does not, as Justice Traynor put it, "become in effect a second jury to determine whether the defendant is guilty." Rather a court, in typical appellate-court fashion, asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element. If the answer to that question is "no," holding the error harmless does not reflec[t] a denigration of the constitutional rights involved. On the contrary, it serve[s] a very useful purpose insofar as [it] block[s] setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial.

*Neder,* 527 U.S. at 19, 119 S.Ct. 1827 (quoted authority and quotation marks omitted) (alterations in original).

{56} Despite the Supreme Court's rejection of the concerns expressed in the majority opinion, the majority appears to agree with those commentators who argue that "review of constitutional error for effect on the jury is the preferred course" and that *Neder* should be overruled in favor of *Sullivan.* *See* Cooper, *supra,* at 340, 345. It is not

within this Court's power to reject binding precedent from the Supreme Court.

{57} Moreover, even if we could choose between *Neder* and *Sullivan,* I believe that *Neder* contains the better policy for constitutional trial errors. I agree with the majority that our review for harmless error is distinct from a review for sufficiency of the evidence. In reviewing a claim for sufficiency, we do not review the record to determine whether there is overwhelming evidence of guilt but only whether there is enough evidence for a rational jury to have found each element beyond a reasonable doubt. Harmless error review, on the other hand, assesses the strength of the properly admitted evidence in relation to the significance of the constitutional error. However, the difference in these standards does not mean that the jury verdict is entitled to no deference in a harmless error review due to the existence of any constitutional error. On this point, it is important to distinguish between structural and trial error. "[T]he central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence...." *Neder,* 527 U.S. at 18, 119 S.Ct. 1827 (quotation marks and quoted authority omitted). Structural errors "affect[ ] the framework within which the trial proceeds," thereby making it impossible to achieve the central purpose of determining guilt or innocence. *Arizona v. Fulminante,* 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

{58} The same is simply not true of trial errors. Even if a constitutional trial error occurs, it is still possible to obtain a constitutionally reliable jury verdict. The *Neder* standard is designed to "promote[ ] public respect for the criminal process by focusing on the underlying fairness of the trial." *Neder,* 527 U.S. at 18, 119 S.Ct. 1827 (quotation marks and quoted authority omitted). The Supreme Court sought to strike "an appropriate balance between society's interest in punishing the guilty [and] the method by which decisions of guilt are to be made." *Id.* (quotation marks and quoted authority omitted) (alteration in original). The Court explicitly determined that a more rigid harmless error standard, such as the one articulated in *Sullivan,* would disrupt this balance.

"To set a barrier so high that it could never be surmounted would justify the very criticism that spawned the harmless-error doctrine in the first place: Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it." *Id.* (quotation marks and quoted authority omitted). The Supreme Court explained that its harmless error analysis furthers the constitutional right to a jury by upholding a constitutionally reliable jury verdict. "[S]afeguarding the jury guarantee will often require that a reviewing court conduct a thorough examination of the record." *Id.* at 19, 119 S.Ct. 1827. Giving no deference to a jury verdict due solely to the existence of a trial error would undermine the jury system itself, for "there can be no such thing as an error-free, perfect trial." *United States v. Hasting,* 461 U.S. 499, 508, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). "[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). "The goal ... is to conserve judicial resources by enabling appellate courts to cleanse the judicial process of prejudicial error without becoming mired in harmless error." *Hasting,* 461 U.S. at 509, 103 S.Ct. 1974 (quotation marks and quoted authority omitted). By applying too rigid of a harmless error standard, appellate courts would relinquish their role as guardians of the fundamental right to a fair trial, "becoming instead impregnable citadels of technicality." *Id.* (quotation marks and quoted authority omitted).

{59} In fact, the standard articulated in *Sullivan* was premised on the existence of some structural error that meant that "there ha[d] been no jury verdict within the meaning of the Sixth Amendment." *Sullivan,* 508 U.S. at 280, 113 S.Ct. 2078; *accord Neder,* 527 U.S. at 39, 119 S.Ct. 1827 (Scalia, J., concurring in part, dissenting in part) (contrasting the *"limited* harmless-error approach of *Sullivan"* with the *"ordinary* harmless-error analysis that the Court would apply"). Although the majority appears to adopt Justice Scalia's dissent in *Neder,* I believe that the reason for his dissent was not because he disagreed with the Court's

traditional harmless error standard for trial errors, such as the one articulated in *Schneble*. Instead, he believed that the error in *Neder*, the omission of an essential element from a jury instruction, was structural and that this structural error nullified the jury's verdict and left no verdict to confirm through harmless error. *See Neder*, 527 U.S. at 38, 119 S.Ct. 1827 (Scalia, J., concurring in part, dissenting in part) ("Harmless-error review applies only when the jury *actually renders* a verdict—that is, when it has found the defendant guilty of all the elements of the crime."). "The amount of evidence against a defendant who has properly preserved his [or her] objection, while *relevant to determining whether a given error was harmless,* has nothing to do with determining whether the error is subject to harmless-error review in the first place." *Id.* at 34, 119 S.Ct. 1827 (Scalia, J., concurring in part, dissenting in part) (emphasis added). When no structural error is involved, that is, when the jury has found the defendant guilty beyond a reasonable doubt of all elements of the crime, the question under harmless-error review even for Justice Scalia is whether the trial error is significant enough to render the jury's verdict constitutionally unreliable. "In finding, for example, that the jury's verdict would not have been affected by the exclusion of evidence improperly admitted ... a court is speculating on what the jury *would have found.*" *Id.* at 37, 119 S.Ct. 1827 (Scalia, J., concurring in part, dissenting in part). By analyzing how a trial error would affect a hypothetical rational jury in light of the properly admitted evidence, an appellate court is not substituting its judgment for that of the jury but rather confirming a judgment that the jury has already made. *Id.* at 38–39, 119 S.Ct. 1827 ("The right to render the verdict in criminal prosecutions belongs exclusively to the jury; reviewing it belongs to the appellate court. 'Confirming' speculation does not disturb that allocation, but 'substituting' speculation does."). Thus, because the jury in the present case found each element of the convictions beyond a reasonable doubt, the limited harmless-error standard of *Sullivan* would not apply even if it had not been modified by *Neder;* instead, whether applying *Neder* or *Sullivan,* the question is whether a rational jury would have reached the same verdict absent the error, and consistent with *Brown, Schneble,* and *Harrington,* overwhelming evidence of guilt is central to this inquiry. *See* Cooper, *supra,* at 337 ("Justice Scalia distinguishes between harmless error review of constitutionally-based evidentiary errors and harmless error review of verdicts reached after constitutionally-deficient jury instructions.... The difference, in essence, is that in the first instance the jury has made a finding of guilt beyond a reasonable doubt as to all the essential elements of the crime, while in the second the required jury finding is necessarily absent.") (footnotes omitted).

{60} The majority also criticizes the Supreme Court's overwhelming evidence of guilt approach as inconsistent with the role of an appellate court. However, the majority's effect-on-the jury approach is susceptible to the same criticism. Constitutional trial errors "infringe upon the jury's factfinding role and affect the jury's deliberative process in ways that are, strictly speaking, not readily calculable." *Neder*, 527 U.S. at 18, 119 S.Ct. 1827. Thus, an effect-on-the-jury approach that asks whether the error influenced this jury, overlooking the amount of additional evidence presented, is more at odds with the role of an appellate court, requiring perhaps a greater degree of speculation about jury deliberations, than the *Neder* hypothetical rational jury model.

> It is argued that we must reverse if we can imagine a single juror whose mind might have been made up because of [the accomplices'] confessions and who otherwise would have remained in doubt and unconvinced. We of course do not know the jurors who sat. Our judgment must be based on our own reading of the record and on what seems to us to have been the probable impact of the two confessions on the minds of an average jury.

*Harrington,* 395 U.S. at 254, 89 S.Ct. 1726; *accord* Cooper, *supra,* at 333 ("[R]eview of error for its effect on the jury requires a counterfactual determination that judges are not qualified to make."). While the Supreme Court's harmless-error inquiry is framed in terms of a hypothetical rational jury, the answer to this question is not a judge-ren-

dered verdict but, instead, simply the product of the typical presumption employed by appellate courts that the jury that actually heard the case acted rationally, thereby determining whether *the actual verdict,* not a hypothetical one, is constitutionally reliable. In my view, it would do more injury to the judicial system to overturn a jury verdict supported by overwhelming evidence of guilt for an insignificant trial error than merely attributing rational acts to the jury. "[R]eversing a conviction for a new trial would be a miscarriage of justice when the outcome would surely be the same." *State v. Livernois,* 1997–NMSC–019, ¶ 15, 123 N.M. 128, 934 P.2d 1057. Defendant was afforded his constitutional right to a jury and that jury found each of the elements of larceny beyond a reasonable doubt. As a result, this verdict is entitled to some appellate deference even if a constitutional trial error occurred, though considerably less than in the absence of such of an error. If a constitutional trial error occurs, the verdict should be affirmed if the State demonstrates beyond a reasonable doubt, such as through overwhelming evidence of guilt, that the conviction itself is constitutionally reliable, thereby ensuring that Defendant received a fair trial.

{61} Of course, even under the *Neder* standard that I believe we are bound to apply, overwhelming evidence of guilt is not the sole criterion in harmless error review. Appellate review of harmless error

> depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, *of course,* the overall strength of the prosecution's case.

*Van Arsdall,* 475 U.S. at 684, 106 S.Ct. 1431 (emphasis added). Nevertheless, "[t]he strength of the government's case against the defendant is probably the most critical factor in determining whether an error affected the verdict. Accordingly, a reviewing court may find that the admission of evidence

was harmless where there is sufficient corroborating evidence to support the conviction." *United States v. Dhinsa,* 243 F.3d 635, 650 (2d Cir.2001) (quotation marks, quoted authority, and citation omitted). The presence of overwhelming evidence is likely to coincide with other *Van Arsdall* factors, including evidence cumulative to or corroborative of the erroneously admitted evidence and the absence of contradictory evidence, and it is much more likely that a constitutional error will be relatively insignificant when the State has established guilt by overwhelming evidence.

{62} By diminishing the importance of overwhelming evidence of guilt in our harmless error review, the majority not only rejects *Neder* but also implicitly overrules numerous New Mexico cases that have relied on the Supreme Court's standard. *State v. Rondeau,* 89 N.M. 408, 416, 553 P.2d 688, 696 (1976) ("[T]he admission of those statements which might possibly be considered violative of the *Bruton* rule was harmless beyond a reasonable doubt since the properly admitted evidence of guilt was overwhelming, and the prejudicial effect of the codefendants' statements was insignificant by comparison. *See Schneble* ...."); *accord, e.g., State v. Herrera,* 102 N.M. 254, 259, 694 P.2d 510, 515 (1985) (relying on overwhelming evidence of guilt for constitutional error); *State v. Finnell,* 101 N.M. 732, 738, 688 P.2d 769, 775 (1984) (same); *State v. Trujillo,* 95 N.M. 535, 541, 624 P.2d 44, 50 (1981) (same); *State v. Gutierrez,* 2003–NMCA–077, ¶ 17, 133 N.M. 797, 70 P.3d 787 (same and citing cases); *State v. Aragon,* 116 N.M. 291, 296, 861 P.2d 972, 977 (Ct.App.1993) (same); *State v. Roybal,* 107 N.M. 309, 312, 756 P.2d 1204, 1207 (Ct.App.1988) (same); *State v. Martinez,* 99 N.M. 48, 52, 653 P.2d 879, 883 (Ct.App.1982) ("Where other properly admitted evidence in the record, overwhelming in its nature, independently establishes proof of defendant's guilt the admission of the challenged evidence is harmless error."); *State v. Thurman,* 84 N.M. 5, 9, 498 P.2d 697, 701 (Ct.App. 1972) (applying *Schneble* ). While I do not disagree with the majority that some of these cases considered factors beyond overwhelming evidence of guilt, consistent with *Van Arsdall,* the focus on the strength of the

prosecution's case in our prior cases clearly differs from the majority's discussion of this factor. I respectfully believe that it is the majority's analysis of harmless error, and not this precedent, that diverges from binding federal law.

{63} As a final point regarding the majority's analysis of harmless error, I respectfully disagree that an accomplice's out-of-court statement has the same effect on a jury as the confessions of defendants themselves. In contrast to the out-of-court statements of an accomplice, an admission of a defendant is treated as non-hearsay under the Rules of Evidence for two reasons. First, admissions do not present any Confrontation Clause concerns because the party is present in court to explain, deny, or rebut the offered statement. Second, and more importantly in terms of the comparison made by the majority, an admission is highly probative because, when offered against the party, "the admission discredits the party's statements inconsistent with the present claim asserted in pleadings and testimony." 2 Kenneth S. Broun et al., *McCormick on Evidence* § 254, at 136 (John W. Strong ed., 5th ed.1999). Thus, a defendant's confession is highly likely to influence a jury because the confession is inconsistent with the defendant's own plea of not guilty, somewhat analogous to a prior inconsistent statement. The same cannot be said of an accomplice's accusation of guilt. In this case, for example, defense counsel argued in closing that the jury should not believe Perches' statement because it was hearsay, it was based on misperception, and it was motivated by a desire to shift blame. These attacks could not have been made on a defendant's own confession. Thus, I believe it is incorrect to suppose that an accomplice's out-of-court statement will have the same "profound impact" on the jury as an admission from the defendant himself or herself. The Supreme Court did not treat the accomplices' statements in *Brown, Schneble,* and *Harrington* the same as the confession in *Fulminante.* In any event, the majority's focus on the "profound impact" of the testimony on the jury reveals its departure from the *Neder* rational jury standard. Under the *Neder* inquiry, we do not evaluate the impact of the impugned evidence on the jury because we

"do not know the jurors who sat." *Harrington,* 395 U.S. at 254, 89 S.Ct. 1726. Instead, "the appellate court ... simply reviews the remainder of the evidence against the defendant to determine whether the admission of the [statement] was harmless beyond a reasonable doubt." *Fulminante,* 499 U.S. at 310, 111 S.Ct. 1246. Because *Neder* establishes the relevant question as whether a rational jury would have convicted a defendant in the absence of the constitutional trial error, it is unnecessary to speculate about the likely impact that an improperly admitted accomplice's statement had on the jury.

{64} Given the limits placed on the use of overwhelming evidence of guilt in a harmless error inquiry and the treatment of accomplices' out-of-court statements like confessions as likely to influence a jury, it is difficult for me to imagine a case involving a *Crawford* error in which the error would be deemed harmless. In this way, it seems to me that the majority's analysis could be interpreted as elevating a simple trial error to virtual structural status. I believe it is unwise, and contrary to the Supreme Court's intent, to compound the dramatic change in the law occasioned by *Crawford* by making a *Crawford* error the functional equivalent of a structural one. For these reasons, I respectfully disagree with the majority's harmless error analysis.

{65} Applying the *Neder* harmless error inquiry, I believe that there is overwhelming evidence of guilt on the larceny convictions and that it is clear beyond a reasonable doubt that a rational jury would have convicted Defendant of larceny even without Perches' statement. In order to prove the larcenies, the State had the burden to show beyond a reasonable doubt that Defendant carried away property with a market value of over $250 and firearms belonging to another with the intent to permanently deprive the owner of them. " 'Carried away' means moving the property from the place where it was kept or placed by the owner.' " UJI 14–1603 NMRA 2004. In addition, the jury was instructed on accomplice liability. Thus, the State did not have to prove that Defendant actually committed the larceny, only that Defendant intended that the crime be commit-

ted, that the crime was committed, and that Defendant helped, encouraged, or caused the crime to be committed.

{66} Ignoring Perches' statement, the State introduced evidence that Defendant, accompanied by a friend, went to a family friend's house in Anthony, New Mexico, on the morning of the burglary and left with the friend around noon in his teal Camaro that had a Texas license plate. Shortly after lunchtime, two men were seen looking in the front window of a mobile home on a five-acre lot in Anthony. The owner, who testified by deposition due to a medical disability that prevented him from traveling to court, arrived at the mobile home within minutes and found a teal Camaro with a Texas license plate in the driveway with no one inside. The owner wrote down the license plate number, which matched the license plate number on Defendant's teal Camaro. The owner then went around the east side of the residence and looked around the back but did not see anyone. He also looked around the west end of the residence but again did not see anyone. He told his brother, who was 100 feet away, to call the police. A few minutes after the owner arrived at the house, a man came around the east side of the residence through a closed gate in a small fenced yard in the back of the residence. He told the owner he was looking for someone dealing with horses, but there were no horses, horse facilities, or barns on the five-acre piece of land. He got into the Camaro and left. The owner identified the man as Defendant in a photo array. The owner's brother, who testified in court, also saw the teal Camaro and wrote down five digits of the Texas license plate, again matching Defendant's car. The owner subsequently went behind the house and found another man coming out of his laundry-room door holding the owner's tape measure and razor knife. The owner noticed a broken window at the back of the house. He told the man to wait for him under the watch of the owner's employee, and the owner went into his residence to find a pile of his belongings in the hallway, including ten rifles, a VCR valued at $200, boots valued at over $50, and tennis shoes valued at $25. The rifles were removed from the owner's gun cabinet by breaking the glass, and the VCR was removed from an entertainment center. The owner stated that none of the items were in the hallway when he left after eating lunch soon before the burglary. A police detective who had investigated numerous burglaries testified that it is common for burglars to put the items they intend to remove in a pile near the exit in order to allow for a quick getaway. The State introduced crime scene photographs showing the broken window and the pile of the owner's belongings. Defendant's family friend testified that Defendant told him, on the night of the burglary, that the friend Defendant had brought with him that morning had been arrested.

{67} From this evidence, it is clear that Defendant had to have been inside the gate in the backyard near the broken window or the owner would have seen him during his initial investigation. This occurred shortly after two men were seen looking into the front windows. Two men were identified at the scene: one was Defendant and one was Perches. Defendant had to have been behind the gate for several minutes while the owner investigated and, if he had been outside at the time, certainly would have heard the owner tell his brother, who was 100 feet away, to call the police. Perches, whose presence at the residence was established by the owner, had no car or other means to take the items in the house after Defendant left. Perches would not have been able to carry ten rifles, a VCR, a pair of boots, a pair of tennis shoes, a tape measure, and a knife from this isolated area without a car or other transportation. Perches was arrested on the day of the burglary, which coincides with Defendant's statement to his family friend that the man he was with that day was arrested.

{68} This evidence corroborates Perches' statements regarding the larceny and renders most of his statements cumulative. Corroboration and cumulative evidence are both listed in *Van Arsdall* as factors relevant to harmless error. 475 U.S. at 684, 106 S.Ct. 1431. In fact, the Supreme Court has specifically indicated in the context of an erroneously admitted out-of-court statement by an accomplice that "the presence of corroborat-

**332**

ing evidence more appropriately indicates that any error in admitting the statement might be harmless." *Idaho v. Wright*, 497 U.S. 805, 823, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). We applied this principle from *Wright* in both *Torres*, 1998–NMSC–052, ¶ 29 n. 4, 126 N.M. 477, 971 P.2d 1267, and *Gonzales*, 1999–NMSC–033, ¶ 39, 128 N.M. 44, 989 P.2d 419. Reference to corroborating evidence has also been made in numerous cases applying *Chapman* and *Van Arsdall*. *E.g., Ross*, 1996–NMSC–031, 122 N.M. at 27, 919 P.2d at 1092 (relying on corroborative evidence based on *Wright*). In addition, because Defendant chose not to present any evidence at trial, Perches' statements are uncontradicted, which is another *Van Arsdall* factor in favor of finding the error harmless.

{69} The majority concludes that Perches' statement was the "clearest evidence" of guilt on the larceny convictions. I respectfully disagree. Perches' statement may have been the clearest evidence of Defendant's actions as a principal, but it was also the State's weakest evidence. Defense counsel attacked the statement on numerous grounds, including misperception and motive to lie. The State's strongest evidence of Defendant's participation in the larcenies was the eyewitness testimony of the victim and his brother that Defendant was at the scene of the crime, near the broken window, during its occurrence, supplemented by the undisputed evidence that the owner's property was moved from its usual place, the evidence that Defendant's vehicle was the only available means to remove the items placed in the hallway, and the evidence that Defendant and Perches were together. To me, the only reasonable conclusion to be drawn from this evidence is that Defendant committed the larcenies or helped Perches commit them. In relation to this overwhelming evidence, Perches' statement was relatively unimportant to the State's case.

{70} In light of the clear evidence of guilt, I believe that the State has shown beyond a reasonable doubt that a rational jury would have convicted Defendant of larceny had Perches' statement been excluded. *Cf. Schneble*, 405 U.S. at 432, 92 S.Ct. 1056 (concluding that " 'the minds of an average

jury' would not have found the State's case significantly less persuasive had the testimony ... been excluded" because there was independent evidence overwhelmingly establishing the defendant's guilt and the co-defendant's confession merely corroborated other evidence). I would therefore affirm these convictions. The majority holding otherwise, I respectfully dissent.