624 P.2d 44

**STATE of New Mexico,
Plaintiff-Appellee,**

v.

**Jesse TRUJILLO, Defendant-Appellant.**

**No. 12677.**

Supreme Court of New Mexico.

Feb. 16, 1981.

John B. Bigelow, Chief Public Defender, Gregory W. Chase and George W. Guzowski, Asst. Public Defenders, Albuquerque, Martha A. Daly, Michael Dickman, Asst. Appellate Defenders, Santa Fe, for defendant-appellant.

Jeff Bingaman, Atty. Gen., Eddie Michael Gallegos, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

FEDERICI, Justice.

This is a direct appeal from a conviction of felony murder. During the early morning hours of January 12, 1979, the body of Charles Radosevich was discovered in the Southeast Heights of Albuquerque. He had been killed by three bullets in the chest. Defendant Jesse Trujillo was arrested for this crime and indicted by the grand jury. The indictment contained an open count of murder and an alternative count of felony murder. Defendant pleaded not guilty to both counts. Defendant was convicted by a jury and sentenced to life imprisonment. He appealed to the Supreme Court.

There are three issues presented in this appeal:

(1) Whether the second of two searches conducted under a single warrant was unreasonable;

(2) Whether a statement by defendant that he was at home on the night of the murder and which statement was admitted in evidence only for impeachment purposes during the trial was obtained in violation of Miranda procedures and suppressible; and

(3) Whether evidence of defendant's escape from the detention center was admissible.

The State's case was based on scientific as well as direct, eyewitness evidence. It included the testimony of David Lopez, Leonard Herrera and Edward Garcia. These three men were friends of defendant and had been with him on the night Radosevich was killed. Dale Rogers, who later made an unsworn confession to the homicide, was also present.

The testimony of David Lopez, Leonard Herrera and Edward Garcia was substantially identical. The men testified that during the early evening of January 11, 1979, the five of them had visited with various friends in Albuquerque. They eventually left defendant's house for a "cruise" at approximately 10:30 p. m. Throughout the night, all five men consumed considerable quantities of marijuana, beer and wine. They were in varying stages of intoxication, but David Lopez testified that he remembered the events "very well."

Some time around 12:30 or 1:00 a. m., they picked up Charles Radosevich, who was hitchhiking, on Yale Avenue. He sat in the front seat between Edward Garcia and Jesse Trujillo. Lopez, Herrera and Dale Rogers were in the back seat. Defendant was armed with a .25 caliber semiautomatic pistol. There was some conversation during the ride, but shortly after Radosevich was picked up he asked to be let off at the corner of Yale and Stadium. Garcia, who was driving, stopped the car. Both Garcia and defendant got out with Radosevich.

Defendant apparently demanded money from Charles Radosevich. Radosevich refused. Defendant shot Charles Radosevich three times. Defendant and Garcia got

back in the car and they drove away at high speed. Defendant said, "let's go, I hit him." Defendant was let out of his car at his house on Gonzales Street.

The body of Charles Radosevich was discovered in less than an hour by a passing neighbor. He called the Albuquerque police. An official investigation began almost immediately. Through the Crimestoppers Program, a confidential informant eventually came forward. The informant contacted Detective Stephen Swanson a few days before defendant's arrest. Detective Swanson used the information supplied by the informant to obtain arrest and search warrants. These were both executed on January 24, the arrest taking place around 3:00 p. m. A search of the house occurred at about 4:45 p. m. and again at 6:10 p. m., in two stages. During the interim between these searches, the informant called the police with new information that the pistol used in the crime was under the doghouse in defendant's backyard.

This second search uncovered a semiautomatic pistol and two boxes of ammunition where the informant said they would be. The pistol and ammunition were introduced into evidence during trial. A firearms expert testified that in his opinion the three bullets in Radosevich's body were fired from this particular pistol. Fingerprints were also lifted from the pistol and its wrappings. Another expert compared these prints with ones taken from defendant after his arrest. In the expert's opinion, all of the fingerprints on the pistol were made by the same person, the defendant.

## I. WHETHER THE SECOND OF TWO SEARCHES CONDUCTED UNDER A SINGLE WARRANT WAS UNREASONABLE.

In this case, a warrant was obtained by Detective Swanson on January 24, 1979. It authorized a search of the entire Trujillo "*premises*" for various items, including the semiautomatic pistol and ammunition used in Charles Radosevich's slaying. The warrant was supported by Detective Swanson's affidavit. The affidavit, in turn, was based on first-hand information from a confiden-

tial informant. Defendant admits that this warrant was valid on its face. However, defendant claims that the search of the yard (under the doghouse) went beyond the warrant's authorization and also constituted a second, separate search and was therefore unreasonable. Accordingly, the defendant moved for suppression of all items seized under this warrant. At the hearing, the trial judge denied the motion.

At approximately 4:45 on the afternoon of its issuance, Detective Swanson, who had arrested defendant just a few hours earlier, was in the process of interrogating him. For that reason Swanson remained in the stationhouse. Sergeant Richard Ness and Detectives Joe Garcia and David Garcia went to the defendant's residence. Two young girls were there. A copy of the warrant was given to one of these girls. The informant had told Detective Swanson that the pistol was hidden in the attic. The officers searched the attic but found nothing. They then searched the rest of the house unsuccessfully. None of the three officers remained on the premises. Detective David Garcia, however, testified that he intended to come back again but first wanted to discuss the situation with Detective Swanson at the stationhouse.

Meanwhile, at about 6:00 p. m., another call was received from the informant. He phoned the stationhouse and spoke with Detective David Garcia. The informant said that somebody had forewarned the Trujillo family of the search. The pistol had been moved, he said, and was now hidden beneath a doghouse in the backyard. Garcia informed Swanson of this conversation. Armed with the same warrant, the two officers returned to the house at approximately 6:10 p. m. Garcia searched a vehicle which was parked in the driveway with its engine on and found nothing. He then re-entered the house. In the meantime, Swanson searched underneath the doghouse in the backyard and found and seized a semiautomatic pistol as well as two boxes of cartridges. The warrant's return and inventory were signed by Detective Swanson two days after the search. They reflected that the warrant had been executed at 5:30 p. m. on January 24, 1979.

Defendant contends that the subsequent search under the doghouse in the backyard was unreasonable. The district judge disagreed, and refused to suppress its fruits on the ground that the searches amounted to a single search separated in time by approximately one hour "and covered, in nature and scope, by the warrant."

This is a question of first impression in New Mexico. Cases from other jurisdictions have adopted the rule that a warrant is executed when a search is conducted, and its legal validity expires upon execution. After execution, no additional search can be undertaken on the same warrant. *State v. Pina*, 94 Ariz. 243, 383 P.2d 167 (1963), *overruled on other grounds, Yuma County Attorney v. McGuire*, 111 Ariz. 437, 532 P.2d 157 (1975); *Delaney v. State*, 135 Ga.App. 612, 218 S.E.2d 318 (1975); *State v. Parsons*, 83 N.J.Super. 430, 200 A.2d 340 (1964); *McDonald v. State*, 195 Tenn. 282, 259 S.W.2d 524 (1953). We do not quarrel with the rule. However, when "exigent circumstances" exist, an exception to the rule arises.

For example, in the *McDonald* case, the court said:

> [O]n principle, as well as on persuasive precedent and sound public policy, this Court is of the opinion that—*nothing else appearing*—a second search of the premises under a search warrant that has already been once served with reference to those premises is an unreasonable search within the meaning of our constitution. (Emphasis added.)

*Id.* at 284, 259 S.W.2d at 525.

■ Under New Mexico case law exceptions are permitted to the general rules of search and seizure when exigent circumstances exist. An exigent circumstance exists if officer in good faith believe that the contraband, or other evidence for which the search is to be made, is about to be removed or destroyed. *State v. Sanchez*, 88 N.M. 402, 540 P.2d 1291 (1975); *State v. Anaya*, 89 N.M. 302, 551 P.2d 992 (Ct.App.1976); *State v. Baca*, 87 N.M. 12, 528 P.2d 656 (Ct.App.1974), *cert. denied*, 87 N.M. 5, 528 P.2d 649 (1974).

■ Exigent circumstances existed in this case at the time of the second stage of the search, pursuant to a valid warrant. The exigent circumstances were: (1) the occupants of the house had been warned that the police were about to search the house; (2) the pistol suspected of being the murder weapon had been moved once in order to hide it from the police and might be moved again or even destroyed; (3) the police in good faith believed that the 6:10 p.m. search was absolutely necessary in these circumstances; and (4) the police in good faith believed there was not time to obtain a second search warrant because of the threat of loss or destruction of evidence. These circumstances were sufficient for the trial judge to rule that the second stage of the search was valid where there was only a period of one hour between the searches and there was testimony that Detective David Garcia intended to return to continue the search after consultation with Detective Swanson. We hold that there was substantial evidence before the trial court for it to find that there was only an interruption of one continuous search rather than two searches here.

■ We note also that the warrant was issued for the *"premises"* which would include the doghouse in the backyard of the home. The word "premises" in a search warrant includes the land, the buildings and the appurtenances thereto. *United States v. Long*, 449 F.2d 288 (8th Cir. 1971); *State v. McClelland*, 215 Kan. 81, 523 P.2d 357 (1974). The trial court correctly ruled that the search was valid.

II. WHETHER A STATEMENT BY DEFENDANT THAT HE WAS AT HOME ON THE NIGHT OF THE MURDER AND WHICH STATEMENT WAS ADMITTED IN EVIDENCE ONLY FOR IMPEACHMENT PURPOSES DURING THE TRIAL WAS OBTAINED IN VIOLATION OF MIRANDA PROCEDURES AND SUPPRESSIBLE.

Prior to trial, the defense moved for suppression of various statements by defend-

**540**

ant. They occurred while defendant was in custody. At the hearing on the motion, Detective Swanson testified that after he arrested defendant, they drove together to the police station.

Defendant was advised of his Miranda rights at the stationhouse. This was done by Detective Swanson from a standard form. Defendant said he understood his rights; both men signed the form. Swanson asked whether defendant "wished to discuss any of the events about the murder," and he said he did not. Swanson then asked if he would mind going into some "background information," such as his birth place, education and previous criminal record. Defendant agreed. The detective's police report reflected that his suspect "refused" to waive his right to counsel, and that he would not talk about the homicide.

Detective Swanson proceeded to elicit various background details. During the course of his interrogation, however, he asked where defendant had been on the night Charles Radosevich was killed. Defendant said he had probably been in bed asleep, since he had to work on the following morning. It was this answer which defendant says violated his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), though it was not suppressed and was admitted in evidence solely for impeachment purposes.

The mandate in *Miranda* is clear:

If [a suspect in custody] indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease * * If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.

*Id.* at 473–74, 86 S.Ct. at 1627–28.

■ The rights granted an accused in *Miranda* have been qualified under certain circumstances. Since *Miranda*, it has become settled law in New Mexico that an accused's right to remain silent, even after he has asserted his right to counsel, may be waived if the waiver is knowingly, intelligently and voluntarily made. *State v. Greene, (II),* 92 N.M. 347, 588 P.2d 548

(1978); *State v. Greene, (I),* 91 N.M. 207, 572 P.2d 935 (1977).

To determine whether the subsequent statement is voluntary this Court said in *Greene, (I)*:

A determination of the voluntariness of the subsequent waiver depends not merely on a formal utterance of waiver, but upon all the facts and circumstances of the particular case. *State v. Crump,* 82 N.M. 487, 484 P.2d 329 (1971). These facts and circumstances include the background, experience and conduct of the accused. *State v. Sexton,* 82 N.M. 648, 485 P.2d 982, *cert. denied,* 82 N.M. 639, 485 P.2d 973 (Ct.App.1971). It is for the trial judge in the first instance to hear the evidence as to voluntariness, weigh the conflicts in the evidence presented at the suppression hearing, and determine whether the State has carried its "heavy burden." Where there is evidence to support the ruling of the trial court, we will not find error as a matter of law. *State v. Ramirez,* [89 N.M. 635, 556 P.2d 43] *supra.* .

*Id.* 91 N.M. at 213, 572 P.2d at 941.

■ Thus, the State has the burden of first showing that a defendant was properly given a statement of his rights under *Miranda*, and that these rights were voluntarily waived. *State v. Gallegos,* 92 N.M. 336, 587 P.2d 1347 (App.1978).

■ In the instant case, the record is clear that Sawnson read the warnings to defendant and that defendant understood them, signing a form to that effect. Defendant had completed his high school education plus one year of college. When he submitted to interrogation concerning his background, he did so voluntarily and with full knowledge that he could remain silent and demand the presence of an attorney before answering questions. We hold that defendant knowingly, intelligently and voluntarily waived his *Miranda* rights when he answered Detective Swanson's question concerning his whereabouts. on the night of the shooting.

Even if we were to assume for purposes of argument that the trial court committed error in failing to suppress the statement under the facts and state of the record in this case, the error was harmless. *See United States v. Morrison,* —— U.S. ——, 101 S.Ct. 665, 66 L.Ed.2d 564, (1981). *Compare Moore v. Illinois,* 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977) *with Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See also Fahy v. Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963).

Here, we have the eyewitness testimony of three of defendant's companions the night of the shooting, and we have expert testimony linking defendant to the pistol used to shoot the victim. The statement defendant wishes to suppress did not relate to an incriminating fact, statement or admission, it was admitted in evidence not for the purpose of incriminating the defendant, but for purposes of impeachment. There was no showing in the record of prejudice or that the statement affected any claimed defense. In view of the totality of circumstances concerning defendant's statement, even if there was error in not suppressing the statement, it had no legal or constitutional significance.

In *Chapman, supra,* the Supreme Court of the United States sets out in detail the basis of constitutional harmless-error:

In fashioning a harmless-constitutional-error rule, we must recognize that harmless-error rules can work very unfair and mischievous results when, for example, highly important and persuasive evidence, or argument, though legally forbidden, finds its way into a trial in which the question of guilt or innocence is a close one. What harmless-error rules all aim at is a rule that will save the good in harmless-error practices while avoiding the bad, so far as possible.

The federal rule emphasizes "substantial rights" as do most others. The California constitutional rule emphasizes "a miscarriage of justice," but the California courts have neutralized this to some ex-

tent by emphasis, and perhaps overemphasis, upon the court's view of "overwhelming evidence." We prefer the approach of this Court in deciding what was harmless error in our recent case of *Fahy v. Connecticut,* 375 U.S. 85 [84 S.Ct. 229, 11 L.Ed.2d 171]. There we said: *"The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." Id.,* at 86–87 [84 S.Ct. at 230]. Although our prior cases have indicated that there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error, this statement in *Fahy* itself belies any belief that all trial errors which violate the Constitution automatically call for reversal. (Emphasis added.)

*Id.* 386 U.S. at 22–23, 87 S.Ct. at 827–828.

We find in the present case that there is no reasonable possibility that the statement complained of contributed to the conviction. Other evidence before the trial court of defendant's guilt is overwhelming. We hold that even if the statement should have been suppressed, its admission in evidence was harmless beyond a reasonable doubt.

## III. WHETHER EVIDENCE OF DEFENDANT'S ESCAPE FROM THE DETENTION CENTER WAS ADMISSIBLE.

After Detective Swanson arrested defendant, he drove defendant to the police station. On the way, defendant freely volunteered: "Ain't this a bitch, I was going to California tonight." There were no prior questions or other conversation by the officer. Defendant also escaped from jail a few months after his arrest. Defendant contends that evidence of the planned flight and the escape should not be admissible as an inference of guilt.

Evidence of flight or an aborted plan of flight is admissible and relevant because it tends to show consciousness of guilt. *State v. Smith,* 89 N.M. 777, 558 P.2d 46 (Ct.App.1976), *rev'd on other grounds, Smith v. State,* 89 N.M. 770, 558 P.2d 39 (1976). Likewise, escape from incarceration

prior to trial is admissible and relevant as an inference of guilt. *State v. Rodriguez*, 23 N.M. 156, 167 P. 426 (1917). Defendant invites us to overrule these decisions. We decline to do so.

 Whether there was possible unfair prejudice in admitting the evidence is a matter within the trial court's discretion. *State v. Smith*, 92 N.M. 533, 591 P.2d 664 (1979). We find no abuse of that discretion.

Further, the trial court properly instructed the jury orally on the legal effect of the admission of the evidence of defendant's flight from jail. Evidence of defendant's flight or escape from jail was properly admitted into evidence.

The judgment and sentence of the trial court are affirmed.

IT IS SO ORDERED.

PAYNE and RIORDAN, JJ., concur.