This decision of the Supreme Court of New Mexico was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Supreme Court.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date: September 9, 2021**

**No. S-1-SC-37807**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**STEVE L. KRAMER,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Christina P. Argyres, District Judge**

Durham, Pittard & Spalding, LLP
Caren Ilene Friedman
Santa Fe, NM

for Appellant

Hector H. Balderas, Attorney General
Marko David Hananel, Assistant Attorney General
Santa Fe, NM

for Appellee

## DECISION

**BACON, Justice.**

**{1}** Defendant Steve Kramer received a life sentence after a jury convicted him of the first-degree, willful and deliberate murder of Vincent Gutierrez (Victim) and aggravated assault with a deadly weapon. He now appeals directly to this Court pursuant to Article VI, Section 2 of the New Mexico Constitution and Rule 12-102(A)(1) NMRA, seeking reversal of his convictions on the basis of insufficient evidence. Defendant further requests a new trial, claiming that admission of the following evidence was erroneous: (1) Victim's hearsay statement, (2) ammunition seized from Defendant's vehicle

pursuant to a search warrant, and (3) a video recording of Defendant's interview with police. Though we agree with Defendant that the district court erred in admitting Victim's statement, we conclude that this error was harmless to the verdict, and we affirm Defendant's convictions. Because the questions of law presented in this appeal are sufficiently answered by New Mexico precedent and sufficient evidence disposes of the issues, we exercise our discretion under Rule 12-405(B) NMRA to issue this nonprecedential decision.

## I.   BACKGROUND

**{2}**   The jury heard two incompatible versions of what happened on the night that Victim was killed. According to the eyewitness testimony of Defendant's friend, Dinah Vargas, Defendant suddenly and unexpectedly shot Victim at Vargas's office. According to Defendant, Victim had been shot before Defendant arrived at the office that night. Based on its verdict, the jury believed Vargas's testimony over that of Defendant. Vargas's version of events follows.

**{3}**   Defendant and Vargas were friends who worked together on social and political issues in Albuquerque. On the night of the killing, Defendant told Vargas that he needed a piece of their shared equipment, which was stored at Vargas's office. The pair arranged to meet at the office in the late evening hours. Vargas arrived first and let Defendant in when he arrived a short while later. Vargas testified that Defendant was acting strangely and asked to use the restroom as soon as he entered the building. While Defendant was in the restroom, Victim, a homeless man Vargas knew to live near the office, knocked on the office door. Vargas went to the door and gestured to him through the glass as if to ask what he was doing there. According to Vargas, Victim responded, "Steve called me over," referring to Defendant. Vargas let Victim into the office and then locked the door behind him.

**{4}**   While waiting for Defendant to exit the restroom, Vargas and Victim conversed in the back room of the office. As Victim spoke, Vargas heard Defendant "grunting" in the restroom and having what sounded like an angry one-way conversation in which Defendant was talking in an "unfamiliar voice."

**{5}**   When Defendant emerged, he joined the group in the back room of the office and sat down. According to Vargas, Defendant continued to act strangely by hiding his face and grunting. Vargas characterized Defendant's behavior as "extreme" and "scary." As Victim finished the story he was telling, Vargas heard "a pop" and smelled smoke. She was not sure what had occurred until she saw Victim grabbing his chest and bleeding profusely.

**{6}**   Vargas testified that Defendant remained seated while she reacted to the shooting. She noticed that the smoke she smelled was coming from Defendant and that he was holding a gun. As Vargas scrambled to find her phone, Defendant stood up and pointed the gun in her face. He told her he would not let her call for help and prevented her from retrieving her phone from her desk. According to Vargas, after Victim cried out

for help, Defendant walked over to the collapsed and bleeding man and said, "Look at him. Look at him. Look what's coming from him."

**{7}**     At that point, Vargas began to inch her way to the front of the office. As she unlocked the front door, she saw Defendant's reflection in the glass, pointing the gun at her back. She left the office and drove to a friend's house, where she and her friend called 9-1-1. Vargas was twice interviewed by police, once on the night of the killing and again during the investigation. The detective on the case testified that Vargas's story was substantively similar at both interviews.

**{8}**     Defendant's version of the events is very different. Defendant agreed that he and Vargas had arranged to meet at Vargas's office so he could collect some equipment, but then his testimony departs drastically from Vargas's. Defendant testified that when he arrived at the office, Vargas was standing in the front entry, which he found unusual. Defendant entered the building and walked to the back part of the office where the equipment was stored. According to Defendant, Vargas did not speak to him and did not follow him into the back office. When Defendant entered the back room, he saw a body on the floor surrounded with blood. He said, "Hello?" and repeated it louder before turning around, thinking he would meet Vargas in the front office to call 9-1-1. By the time he got to the front door, Vargas was already in her vehicle driving away.

**{9}**     According to Defendant, he then went to his truck to call for help, but he was unable to find his phone. He sat in his truck for a while before returning to the office to look for a phone inside. He found one on Vargas's desk, and when he went to grab it, he noticed a .38 caliber pistol sticking out from underneath the computer keyboard. Defendant picked up the gun and stuck it under his arm as a precaution. He tried unsuccessfully to power on two cell phones he found in the back room before leaving that room and closing the interior door that separated the front and back of the office. Defendant thought that Vargas had called the authorities, so he turned on all the lights to allow first responders to better locate the building. He waited for "a good little bit of time" for someone to "show up" before eventually exiting the building around the time that officers arrived on the scene.

**{10}**    Officer testimony and lapel camera footage continue the story from this point. Sergeant Nick Wheeler testified that he and two other officers responded on the night of the shooting. Sergeant Wheeler's lapel camera footage covers the same events that he reported with his testimony. While searching the area around the office, Sergeant Wheeler observed Defendant's white pickup truck parked in front of the building. As the officers were waiting for backup to clear the building, Defendant walked out of the front door of the office with his arms tucked to his sides and two cell phones in hand. Defendant informed the officers that he had a pistol on him as officers began handcuffing him. Defendant asked "What's going on?" and said to the officers, "You scared the shit out of me." When an officer asked whether anyone was inside the building "bleeding out," Defendant responded, "No, sir." But when officers proceeded to enter the office, Defendant told Sergeant Wheeler, "There's a dead guy in there . . . but I didn't kill him."

**{11}** Victim died of internal bleeding caused by a single gunshot wound to the chest. The manner of death was homicide. Forensic testing concluded that the gun that fired the fatal shot was the same .38 caliber handgun Defendant was holding when officers arrived.

**{12}** Defendant was charged with an open count of murder for the death of Victim and aggravated assault with a deadly weapon for threatening Vargas with the gun. The jury returned guilty verdicts for first-degree, willful and deliberate murder, contrary to NMSA 1978, Section 30-2-1(A)(1) (1994), and aggravated assault with a deadly weapon, contrary to NMSA 1978, Section 30-3-2(A) (1963). Because the jury determined that he used a firearm in the commission of the offense, the sentence for Defendant's aggravated assault conviction was enhanced pursuant to NMSA 1978, Section 31-18-16 (1993). Additional facts are provided as necessary.

## II.    DISCUSSION

**{13}** In this opinion, we first address Defendant's request for a new trial based on three evidentiary errors. We then turn to Defendant's remaining arguments regarding the sufficiency of the evidence to support his convictions. As we explain herein, we conclude that Defendant received a fair trial and that his convictions of aggravated assault with a deadly weapon and first-degree, willful and deliberate murder were each supported by sufficient evidence.

### A.    Any Evidentiary Errors Do Not Merit a New Trial

**{14}** Defendant alleges that the district court committed three errors that each rise to the level of reversible error. In the alternative, he claims that even though each error may have been harmless to the verdict, the cumulative effect of these errors deprived him of a fair trial. First, Defendant argues that the district court erred in admitting Vargas's testimony recounting something Victim said, prior to the killing, that amounts to inadmissible hearsay. Second, Defendant claims that the district court erroneously denied his motion to suppress ammunition seized during a police search of his vehicle. Finally, Defendant asserts that the district court erred in admitting the video recording of his interview with police. We address each claim in turn before assessing whether Defendant's trial was tainted by cumulative error.

### 1.    The district court erred in admitting Victim's hearsay statement, but that error was harmless

**{15}** Vargas testified that when Victim arrived outside her office, he told her, "Steve called me over." The district court overruled Defendant's hearsay objection to this statement and denied defense counsel's request for a bench conference.

**{16}** Hearsay is an out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted in the statement." Rule 11-801(C) NMRA. Hearsay is not admissible if it does not fit into an exemption or exception in the Rules of Evidence. Rule 11-802 NMRA. Because Defendant objected to the statement's admission as hearsay, this issue is preserved, Rule 12-321(A), and is reviewed for an abuse of discretion, *see*

*State v. Benavidez*, 1999-NMSC-041, ¶ 4, 128 N.M. 261, 992 P.2d 274. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the trial court abused its discretion by its ruling unless we can characterize it as clearly untenable or not justified by reason." *State v. Salazar*, 2007-NMSC-004, ¶ 10, 141 N.M. 148, 152 P.3d 135 (internal quotation marks and citation omitted). If we conclude that the district court abused its discretion in admitting the statement, we must then review for harmless error to determine whether "there is a reasonable probability that [the] misconduct contributed to the [defendant's] conviction." *State v. Leyba*, 2012-NMSC-037, ¶ 24, 289 P.3d 1215 (second alteration in original) (internal quotation marks and citation omitted) (applying the nonconstitutional harmless error standard to erroneously admitted hearsay).

**{17}** Our hearsay analysis proceeds in three steps. We ask whether (1) the statement was an out-of-court assertion, (2) the statement was offered to prove the truth of the matter asserted, and (3) the statement meets an exemption or exception to the rule against hearsay. *See* Rule 11-801(C), (D). The hearsay at issue is actually comprised of two out-of-court utterances: what Victim told Vargas and what Defendant allegedly said to Victim, inviting him to come over to the office. Defendant's invitation to Victim is contained within Victim's statement to Vargas. We apply our hearsay analysis to both statements, beginning with Defendant's supposed invitation to Victim to come to Vargas's office.

### a. Defendant's alleged invitation was not hearsay

**{18}** Our analysis starts with Defendant's purported out-of-court statement inviting Victim to come to the office on the night of the killing. We presume for the sake of our analysis that Defendant's statement was an out-of-court assertion that was offered for the truth of the matter asserted. This presumption allows us to contemplate the third step of our analysis—whether the statement meets an exception to or exemption from the rule against hearsay, Rule 11-802. We find an applicable exemption in Rule 11-801(D)(2): "An opposing party's statement." If a statement made by an opposing party is offered against that party, then the statement is "not hearsay." *Id.* Defendant made the statement at issue and the State offered the statement against Defendant in its case-in-chief. For this reason, we conclude that Defendant's alleged invitation to Victim to come by the office is exempted from the rule against hearsay. Therefore, Defendant's invitation would be admissible, but only if Victim's statement to Vargas was admissible.

### b. Victim's statement was inadmissible hearsay

**{19}** Victim's statement to Vargas requires a more detailed review for admissibility. "Steve called me over" is an out-of-court statement which the State offered at trial for the truth of the matter asserted. On appeal, the State agrees that this statement is hearsay because the State sought its admission to prove that Defendant really did call Victim over. This would show that Defendant had a plan to get Victim to the office in the moments preceding the killing. The State argues, however, that this statement meets the "then-existing state of mind" exception to the rule against hearsay. Under Rule 11-803(3) NMRA, "A statement of the *declarant's* then-existing state of mind (such as

motive, intent, or plan)" is "not excluded by the rule against hearsay." *Id.* (emphasis added). In this portion of the analysis, because we are assessing whether *Victim's* statement was admissible hearsay, Victim is the declarant. The State asserts that Victim told Vargas about Defendant's invitation to explain Victim's then-existing motive for arriving at the office.

**{20}**    While a statement showing the declarant's then-existing state of mind is admissible, a statement explaining *why* the declarant held that state of mind is not admissible. *See State v. Baca*, 1995-NMSC-045, ¶ 19, 120 N.M. 383, 902 P.2d 65. We have explained that the then-existing state of mind exception "is limited to statements showing the [declarant's] mental state, *not its cause.*" *Leyba*, 2012-NMSC-037, ¶ 13 (emphasis added). For example, in *Leyba*, written statements of the murder victim's state of mind "such as 'Im scared' and 'Im so mad an sad an confused'" met the exception under Rule 11-803(3). *Leyba*, 2012-NMSC-037, ¶ 14. However, statements like "'my boyfriend hit me cuz we were argueing so he gave me a fat lip and a black eye an a big bruzed on my check bone" were not admissible. *Id.* Those statements described past events and explained the reason for the declarant's state of mind—why the victim was scared, mad, sad, and confused. *See id.* In this case, Victim's statement—"Steve called me over."—describes the reason Victim came to the office that night; it does not describe Victim's state of mind once he arrived at the door. Because Victim's statement described a past event that *caused* him to act, the hearsay does not fall under the exception of Rule 11-803(3). Therefore Victim's statement was barred by the rule against hearsay, Rule 11-802, and the district court erred in admitting it. We must next determine whether the erroneous admission of Victim's statement constitutes reversible error.

### c.    Admission of the hearsay statement was harmless error

**{21}**    Because this issue was preserved below, we review the district court's erroneous admission of Victim's hearsay statement under a harmless error standard. *See Leyba*, 2012-NMSC-037, ¶ 24. This nonconstitutional evidentiary error only "requires reversal when there is a reasonable probability that [the] misconduct contributed to the [defendant's] conviction." *Id.* (second alteration in original) (internal quotation marks and citation omitted). To determine whether there was a "reasonable probability" that the improperly admitted hearsay contributed to the jury's guilty verdict, we must evaluate the "error itself" as well as "all circumstances surrounding the error." *Id.* These circumstances include "the source of the error and the emphasis placed on the error at trial." *Id.* Since we evaluate "the error in context, we often look at the other, non-objectionable evidence of guilt, not for a sufficiency-of-the-evidence analysis, but to evaluate what role the error played at trial." *Id.* We may also "examine the importance of the erroneously admitted evidence in the prosecution's case, as well as whether the error was cumulative or instead introduced new facts." *State v. Tollardo*, 2012-NMSC-008, ¶ 43, 275 P.3d 110 (brackets, internal quotation marks, and citation omitted).

**{22}**    The admission of Victim's hearsay statement did not play a significant role at trial. The State did not rely on Victim's statement in proving its case against Defendant. Neither party mentioned Victim's statement again after Vargas gave her testimony, even

in closing arguments. In recounting Vargas's testimony during closing, the State reminded the jury that Vargas said it was unusual that Victim had come to the office that night, but the State did not tie Victim's unexpected appearance to his statement that Defendant had invited him over. An analysis of the circumstances surrounding the error demonstrates that it was not reasonably probable that the hearsay contributed to Defendant's convictions. For this reason, we conclude that the district court's admission of the hearsay evidence was harmless error. We turn to Defendant's remaining claims of evidentiary error.

## 2.      Any error in the admission of the ammunition was harmless

**{23}**    Defendant next argues that ammunition found in a police search of his vehicle should have been suppressed. Investigating officers obtained a search warrant and seized ammunition from Defendant's truck several days after the shooting. Specifically, police seized one .38 special cartridge, which could have been used in the murder weapon, and five .380 caliber cartridges. By the time officers sought a warrant and executed the search, Defendant's truck had been towed by a private company to a private tow lot. Unbeknownst to the lead detective who applied for the search warrant, someone had broken into the truck between the time of the killing and the eventual search of the vehicle.

**{24}**    Defendant makes two arguments in support of his claim that the ammunition should have been suppressed. First, he asserts that the search warrant was not supported by probable cause, so the ammunition was the fruit of an unconstitutional search in violation of the Fourth Amendment of the United States Constitution and Article II, Section 10 of the New Mexico Constitution. Second, he argues that the chain of custody was broken because the truck was burglarized after the night of the murder. For that reason, the ammunition could not be properly authenticated and should have been excluded as irrelevant. Assuming that the district court erred on either of these grounds, and because Defendant moved to suppress this evidence on both grounds argued on appeal, the admission of the ammunition must undergo harmless error review. *See State v. Lopez*, 2007-NMSC-049, ¶¶ 11-12, 15, 142 N.M. 613, 168 P.3d 743 (determining that by objecting and joining a motion claiming trial court error, the defendant preserved a constitutional issue for appeal and review for harmless error).

**{25}**    The standard of review for harmless error depends on whether the claimed error is constitutional or not. *See Tollardo*, 2012-NMSC-008, ¶¶ 36, 43. For constitutional errors, we must determine whether there was a "reasonable possibility" that the error affected the verdict. *See id.* For nonconstitutional errors, we ask whether there was a "reasonable probability" that the error affected the verdict. *See id.* To determine the effect of the error, we "evaluate all of the circumstances surrounding the error." *Id.* ¶ 43. Such circumstances include "the source of the error and the emphasis placed upon the error." *Id.* "[E]vidence of a defendant's guilt separate from the error may often be relevant, even necessary, for a court to consider, since it will provide context for understanding how the error arose and what role it may have played in the trial proceedings." *Id.*

**{26}** We conclude that any error in the admission of this evidence—constitutional or not—was harmless because the ammunition evidence was not heavily emphasized at trial and was relatively insignificant in light of the other, properly admitted evidence. The majority of the State's case on the first-degree murder charge focused on three sources of evidence: (1) Vargas's testimony that Defendant shot Victim in front of her, (2) the fact that police watched Defendant exit the office with the murder weapon in his possession, and (3) various inconsistencies within Defendant's version of events. The finding of ammunition in Defendant's truck was not a meaningful component of the State's case. In closing argument, the State mentioned the ammunition only once with the caveat that someone had broken into the truck by the time the police searched the vehicle and found the cartridges. The State reminded the jury "that there was some ammunition in the truck, that was searched, of the defendant. Now, granted, it was broken into. [The defense] had an issue with that, but there was still a .38-caliber cartridge in that truck and other multiple cartridges." Evidence that Defendant may have possessed a common type of ammunition that happened to fit the murder weapon does little to advance the State's case given the significant probative value of the fact that Defendant walked out from the scene of the crime holding the gun that killed Victim. For the foregoing reasons, we conclude that any possible error in the admission of the ammunition was harmless to the guilty verdict. *Cf. State v. Trujillo*, 1981-NMSC-023, ¶ 26-29, 95 N.M. 535, 624 P.2d 44 (assuming error for the sake of argument and resolving the issue by concluding that any error was harmless to the verdict).

### 3. The district court did not abuse its discretion in admitting the interrogation video

**{27}** Turning to Defendant's final argument, he asserts that admission of the police interrogation video was improper because the video was not relevant or, in the alternative, was unfairly prejudicial or cumulative evidence. In the video, Defendant is seen murmuring to himself, grunting, humming, and stretching across the interview table while waiting for officers to enter the room. The video ends shortly after questioning begins because Defendant asserted his right to counsel. Defendant twice requested that the video be suppressed under Rules 11-401 NMRA and 11-403 NMRA, but the district court denied his requests before trial.

**{28}** We review this admission of evidence for an abuse of discretion. *See State v. Bailey*, 2017-NMSC-001, ¶ 12, 386 P.3d 1007. Under Rule 11-401, "Evidence is relevant if A. it has any tendency to make a fact more or less probable than it would be without the evidence, and B. the fact is of consequence in determining the action." Any evidence, though relevant, may nonetheless be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . or needlessly presenting cumulative evidence." Rule 11-403. "Evidence is unfairly prejudicial if it is best characterized as sensational or shocking, provoking anger, inflaming passions, or arousing overwhelmingly sympathetic reactions, or provoking hostility or revulsion or punitive impulses, or appealing entirely to emotion against reason." *Bailey*, 2017-NMSC-001, ¶ 16 (internal quotation marks and citation omitted). "The determination of unfair prejudice is fact sensitive, and, accordingly, much leeway is given trial judges

who must fairly weigh probative value against probable dangers." *Id.* (internal quotation marks and citation omitted).

**{29}** The State correctly argues on appeal that the interrogation video was relevant because it supported Vargas's testimony that Defendant was acting strangely on the night of the murder by continually grunting and talking to himself. Defendant's similar behavior on the video tends to show that Vargas gave an accurate account of the way Defendant was acting on the night of the killing. Defendant's state of mind, as exhibited through his behavior, is a "fact of consequence in determining" whether Defendant committed first-degree, willful and deliberate murder. Rule 11-401. Accordingly, the interrogation video was relevant evidence.

**{30}** Given the high probative value of this evidence, the interrogation video would have to be fairly shocking or needlessly cumulative to be excluded by the district court under Rule 11-403. Though Defendant is shown talking to himself and acting rather strangely, the video does not invoke the kind of emotional response required to meet the definition of unfairly prejudicial. In addition, because Defendant's odd behavior is not clearly shown in other video evidence, the interrogation video is not needlessly cumulative. For these reasons, we conclude that the district court did not abuse its discretion in admitting the police interrogation video.

### 4. Cumulative error did not deprive Defendant of a fair trial

**{31}** Defendant requests that we assess the aforementioned errors under the cumulative error doctrine. "The doctrine of cumulative error applies when multiple errors, which by themselves do not constitute reversible error, are so serious in the aggregate that they cumulatively deprive the defendant of a fair trial." *State v. Roybal*, 2002-NMSC-027, ¶ 33, 132 N.M. 657, 54 P.3d 61. This doctrine is to be strictly applied. *Id.* Defendant fails to explain why the aggregate effect of the claimed evidentiary errors amounts to the deprivation of a fair trial in this case. Absent any "explanation of how or why we should apply" the cumulative error doctrine to the facts of Defendant's case, we decline to consider this argument. *See Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70-71, 309 P.3d 53 (explaining that appellate courts will not review an inadequately briefed issue). Having disposed of Defendant's claims of evidentiary error, we next address Defendant's arguments that neither of his convictions were supported by sufficient evidence.

### B. Sufficient Evidence Supports Both Convictions

**{32}** Defendant argues that neither his aggravated assault with a deadly weapon conviction nor his first-degree, willful and deliberate murder conviction was supported by sufficient evidence. Our review of the sufficiency of the evidence to support a given conviction is highly deferential to the jury's guilty verdict.

> We review whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction. Evidence is viewed in

the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict. In particular, New Mexico appellate courts will not invade the jury's province as fact-finder by second-guessing the jury's decision concerning the credibility of witnesses, reweighing the evidence, or substituting its judgment for that of the jury. So long as a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction, we will not upset a jury's conclusions.

*State v. Garcia*, 2011-NMSC-003, ¶ 5, 149 N.M. 185, 246 P.3d 1057 (brackets, internal quotation marks, and citations omitted). We turn first to Defendant's conviction of aggravated assault with a deadly weapon.

## 1. Sufficient evidence supports Defendant's conviction of aggravated assault with a deadly weapon

**{33}** The jury was instructed that finding Defendant guilty of aggravated assault with a deadly weapon required finding, among other facts, that "[D]efendant pointed a firearm at Dinah Vargas." In arguing that his conviction for aggravated assault was not supported by sufficient evidence, Defendant asks us to question the jury's finding that Defendant pointed a firearm at Vargas. At trial, Vargas testified that Defendant pointed a gun at her immediately after the shooting and a second time as she was fleeing the office. Defendant argues that this testimony is insufficient to prove the elements of aggravated assault because Vargas was not a reliable witness. Defendant asserts that Vargas was not a credible witness because she did not mention that Defendant pointed the gun at her when she first talked with police. It was not until her second interview that Vargas told police Defendant had threatened her with the gun, which was also her testimony at trial.

**{34}** Because we refrain from "second-guessing the jury's decision concerning the credibility of the witnesses," *id.* ¶ 5 (internal quotation marks and citation omitted), we reject Defendant's challenge to the evidence on these grounds. Vargas's testimony that Defendant threatened her by twice pointing a gun at her is sufficient to support a conviction for aggravated assault with a deadly weapon and the corresponding firearm enhancement for that conviction. Accordingly, we affirm Defendant's conviction of aggravated assault with a deadly weapon.

## 2. Sufficient evidence supports Defendant's conviction of first-degree murder

**{35}** Defendant's main argument on appeal is that his conviction of first-degree, willful and deliberate murder was not supported by sufficient evidence that he killed Victim or, alternatively, by sufficient evidence that he deliberated prior to the killing. First-degree, willful and deliberate murder is defined as "the killing of one human being by another without lawful justification or excuse . . . by any kind of willful, deliberate and premeditated killing." Section 30-2-1(A)(1). To find Defendant guilty, the jury was instructed that it must find each of the following elements of the crime beyond a reasonable doubt:

1. [D]efendant killed [Victim];
2. The killing was with the deliberate intention to take away the life of [Victim];
3. This happened in New Mexico on or about the 28th day of October, 2017.

These elements guide our ensuing analysis.

**{36}** Before we engage in that analysis, we pause to address Defendant's additional arguments that the district court erred in denying his motion for directed verdict at the close of the State's case and in denying his motion for new trial. Defendant does not assert any supplemental grounds to support reversal of the district court on these rulings. Instead, he reasserts his argument that insufficient evidence supported the first-degree murder charge and conviction. We therefore decline to address Defendant's specific arguments regarding the denial of the directed verdict and new trial motions. Instead, we consider only Defendant's argument on appeal that insufficient evidence supported the jury's guilty verdict on the charge of first-degree murder. As we explain, we conclude that the State presented sufficient evidence to prove both that Defendant killed Victim and that the killing was deliberate.

### a. Sufficient evidence proves that Defendant killed Victim

**{37}** Defendant claims that the State failed to prove beyond a reasonable doubt that he was the one who killed Victim. As a starting point, Defendant relies on his testimony at trial that he did not kill Victim but rather that Victim was already dead when Defendant arrived at the office that night. Defendant additionally argues that the State failed to prove he was the killer because it relied on evidence collected through an inadequate police investigation. According to Defendant, the police botched the investigation in several ways: the lead homicide detective did not walk the scene of the crime, the police did not request latent fingerprints from the gun, the DNA expert was not able to conclude that male DNA from the gun was Defendant's, a shoeprint at the scene did not match Defendant's shoes, the police determined that the murder weapon was not stolen but did not determine the identity of the registered owner of the gun, the officers did not seal Defendant's truck and did not search the vehicle until several days after the killing, and the police did not investigate Vargas as a suspect. As a result of all this, Defendant asserts that there was no physical evidence tying him to Victim's death.

**{38}** The State responds that sufficient evidence proved Defendant was the killer because police watched Defendant walk out of the scene with the murder weapon in his possession, and Vargas testified that she observed Defendant shoot Victim in front of her. In light of the jury's guilty verdict and our duty to resolve all evidentiary conflicts in favor of that verdict, *see Garcia*, 2011-NMSC-003, ¶ 5, we conclude that the State presented sufficient evidence to prove beyond a reasonable doubt that Defendant killed Victim. The last question before us is whether the State presented sufficient evidence of Defendant's deliberation before he killed.

**b.    Sufficient evidence proves that Defendant killed deliberately**

**{39}**    In the alternative to his first argument on sufficiency, Defendant further alleges that the State failed to prove that he deliberated prior to killing Victim. In support of his argument that he did not act deliberately, Defendant asserts that he harbored no ill will for Victim and that the State failed to put on evidence of a motive or plan from which the jury could infer his deliberation. The State responds that it proved deliberation based on the following facts from Vargas's testimony: Defendant had several minutes to consider his actions before shooting Victim, he showed no remorse after the killing, and he threatened Vargas when she tried to call for help. The State also relies on Victim's statement that he came to the office at Defendant's request as evidence that the murder was the result of Defendant's deliberate and premeditated plan. However, because we have concluded herein that this statement was erroneously admitted, this piece of evidence is not considered in our sufficiency review.

**{40}**    We review the properly admitted evidence against the definition of deliberate intention, as explained in our Uniform Jury Instruction, UJI 14-201 NMRA, and as stated in the jury instruction for this case. In assessing whether Defendant acted with a "deliberate intention" to kill, the jury may infer "from all of the facts and circumstances of the killing" whether Defendant's actions were "arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action." *Id.* Further, "[a] calculated judgment and decision may be arrived at in a short period of time," and "[a] mere unconsidered and rash impulse, even though it includes an intent to kill, is not a deliberate intention to kill." *Id.* Ultimately, "[t]o constitute a deliberate killing, the slayer must weigh and consider the question of killing and his reasons for and against such a choice." *Id.*

**{41}**    "Intent is subjective and is almost always inferred from other facts in the case, as it is rarely established by direct evidence." *State v. Sosa*, 2000-NMSC-036, ¶ 9, 129 N.M. 767, 14 P.3d 32 (quoting *State v. Vigil*, 1990-NMSC-066, ¶ 2, 110 N.M. 254, 794 P.2d 728 (internal quotation marks omitted)). The State cannot rely solely on the fact that Defendant had enough time to form deliberate intent; it must prove additional evidence of deliberation. *See State v. Tafoya*, 2012-NMSC-030, ¶ 54, 285 P.3d 604 ("Although . . . the law allows for a jury to infer that a short amount of time can be sufficient to form deliberate intent, without other evidence supporting the inference that deliberate intent was actually formed, it would be difficult to ever make a principled distinction between an impulsive killing and one that is deliberate and premeditated." (internal quotation marks and citation omitted)). Additional evidence of deliberation may include Defendant's calm demeanor in the presence of the dying victim, a lack of remorse on the part of Defendant, bringing the murder weapon to the scene, and attempting to deceive law enforcement. *See State v. Flores*, 2010-NMSC-002, ¶ 22, 147 N.M. 542, 226 P.3d 641 (explaining that deliberation was proven, in part, with evidence that the defendant carried the murder weapon "to the fatal confrontation for no other discernible purpose than to use it as a weapon, . . . immediately and calmly walked away from [the victim's] bleeding body," and attempted "to deceive and evade the authorities"), *overruled on other grounds by State v. Martinez*, 2021-NMSC-002, ¶ 87, 478 P.3d 880; *see also State v. Guerra*, 2012-NMSC-027, ¶ 29, 284 P.3d 1076

(explaining that deliberation can be supported with evidence that the defendant showed no remorse and even bragged about his deadly actions); *State v. Lucero*, 1975-NMSC-061, ¶ 7, 88 N.M. 441, 541 P.2d 430 (explaining that deliberation can be supported with evidence that the defendant brought a loaded and concealed weapon to the scene of the murders).

**{42}** To refute the State's claim of sufficient evidence, Defendant analogizes to four first-degree murder cases where we have concluded that the evidence presented failed to prove deliberation: *State v. Garcia*, 1992-NMSC-048, 114 N.M. 269, 837 P.2d 862; *Tafoya*, 2012-NMSC-030; *State v. Adonis*, 2008-NMSC-059, 145 N.M. 102, 194 P.3d 717; and this Court's unpublished decision in *State v. Carmona*, S-1-SC-36031, dec. (N.M., Jan. 25, 2018) (nonprecedential). In two of those cases, the killings were the result of drunken quarrels that unexpectedly turned deadly. In *Garcia*, we concluded the defendant was not shown to have deliberated prior to stabbing the victim in a yard fight. *See* 1992-NMSC-048, ¶ 28. Instead, we determined that the killing was "rash and impulsive"—a second-degree murder. *Id.* ¶¶ 22, 28. Similarly, in *Carmona*, we concluded that the defendant did not deliberate prior to shooting the victim during a sudden brawl between neighbors. *Carmona*, S-1-SC-36031, dec. ¶¶ 4-8, 30-31. Rather, the defendant's actions in that case bore "all the hallmarks of a non-deliberate, rash and impulsive second-degree killing." *Id.* ¶ 30 (internal quotation marks and citation omitted). There is no evidence in this case that Defendant killed Victim on a rash impulse, fueled by unresolved conflict and intoxication. For that reason, analogy to *Garcia* and *Carmona* does not support Defendant's position.

**{43}** Turning to *Tafoya*, evidence of a sudden shooting with no apparent motive is not enough evidence *on its own* to prove deliberation. 2012-NMSC-030, ¶¶ 52-55. In *Tafoya,* the defendant fired several gunshots while riding in the back seat of a car after spending several hours drinking and doing drugs. *Id.* ¶¶ 5-7. One shot killed the front-seat passenger. *Id.* ¶¶ 1, 7-8. The driver was also shot but survived. *Id.* ¶¶ 7-8. Defendant was convicted of first-degree felony murder and attempted first-degree murder. *Id.* ¶ 1. On these facts, we concluded that the State failed to prove that the defendant deliberated prior to firing at the driver of the car, so we vacated the attempted first-degree murder conviction in favor of entry of judgment on attempted second-degree murder. *Id.* ¶ 55. We rested our conclusion on evidence that the defendant was drunk and high, the shooting was sudden, it was not unusual for the defendant to carry a gun, and there was no apparent motive. *Id.* ¶ 46. Because we determined that the shooting of the passenger was second-degree, rash and impulsive murder, we determined that the shooting of the driver was also committed impulsively, and not deliberately. *Id.* ¶ 54.

**{44}** The *Tafoya* case bears some similarity to Defendant's case. In both cases, the State did not prove a motive or demonstrate any prior conflict between the killer and the victim. Like the shooting in *Tafoya*, the shooting in this case was sudden and unexpected, according to Vargas. However, the takeaway from *Tafoya* is that the State must put on more evidence of deliberation than simply sufficient time to weigh and consider the killing. *Id.* ¶¶ 52, 54 (explaining that "[t]he only evidence that served to support the attempted first degree murder charge . . . was time" and that "without other evidence supporting the inference that deliberate intent was actually formed, it would be

difficult to ever make a principled distinction between an impulsive killing and one that is deliberate and premeditated" (internal quotation marks and citation omitted)). In this case, the State presented the following evidence in addition to proving sufficient time to deliberate: Defendant's comments and demeanor while watching Victim die, Defendant's assault on Vargas to prevent her from calling for help, the fact that Defendant likely brought the murder weapon to the office that night, and Defendant's initial attempt to mislead officers. Because there is more evidence of deliberation in this case, our holding in *Tafoya* does not necessitate a reversal of Defendant's conviction.

**{45}**    Defendant's final analogy to *Adonis*, 2008-NMSC-059, provides the most support for his argument that the State failed to show deliberation. In *Adonis*, we concluded that the State did not present sufficient evidence of deliberation in order to meet the "clear and convincing" standard for criminal commitment for first-degree murder. *Id.* ¶¶ 5, 7, 17, 26. The defendant in that case fired multiple shots at the victim after the victim parked in the spot outside his apartment. *Id.* ¶¶ 3-4. After the shooting, when the victim's brother asked the defendant why he did it, the defendant replied, "That will teach this guy a lesson not to park in my place no more." *Id.* (brackets and internal quotation marks omitted). Although the defendant had time to deliberate prior to the killing, while he retrieved the weapon and left his apartment to confront the victim, we held that the State failed to provide evidence that the defendant "actually" deliberated prior to shooting the victim. *Id.* ¶¶ 20-22. We explained that a defendant's statement *after* the killing does not prove that the defendant deliberated *prior* to the killing. *Id.* ¶ 25.

**{46}**    In both *Adonis* and the instant case, the shootings occur suddenly and without a logical motive. The key difference in this case is that an eyewitness testified to Defendant's demeanor *while* Victim was dying. As opposed to the defendant's statement after the shooting in *Adonis*, Defendant's unprovoked statement as he stood over Victim's body and watched him bleed to death—"Look at him. Look at him. Look what's coming from him."—leads to a reasonable inference that Defendant had contemplated the effect of his deadly actions and resolved to deliberately end Victim's life. This inference is supported by Vargas's testimony that Defendant assaulted her to prevent her from calling emergency services and then proceeded to ignore Victim's cries for help. There is no such evidence that the defendant attempted to prevent anyone from trying to help the victim in *Adonis*.

**{47}**    In addition to this evidence, the State presented three more crucial pieces of information to demonstrate that Defendant deliberated prior to the murder. First, Defendant had sufficient time to deliberate his actions. This is based on Vargas's testimony that Defendant and Victim were together for approximately four minutes before Defendant fired the deadly shot.

**{48}**    Second, Defendant brought the murder weapon with him to the office. Vargas testified that she kept only one unloaded and disassembled gun in a case at the office, but that gun was not the murder weapon. This testimony is corroborated by crime scene photos depicting an unopened gun case tucked behind a computer at the scene of the crime. The jury could reasonably infer that Defendant brought the murder weapon to the

office based on Vargas's testimony that she knew Defendant had access to several firearms.

**{49}** Finally, Defendant attempted to evade and deceive law enforcement. According to Vargas, Defendant assaulted her to prevent her from calling the police. When the police arrived, Defendant acted as if nothing unusual had transpired, even though Defendant testified at trial that he was expecting law enforcement and had tried to make it easier for police to find the correct office. Despite his testimony that he was waiting for police to arrive, Defendant exhibited surprise upon seeing officers outside the office and asked them what was going on. When an officer directly asked Defendant whether someone was inside the building "bleeding out," Defendant obfuscated the truth by responding, "No, sir." Then, when officers entered the office to examine the scene, Defendant backtracked, telling a nearby officer that there was a dead man inside but that Defendant had not killed him. Defendant's actions are inconsistent with his testimony and show an attempt to deceive the police as they started their investigation of the murder.

**{50}** For the foregoing reasons, we conclude that sufficient evidence of deliberation supports Defendant's conviction of first-degree murder. Defendant had sufficient time to consider his deadly actions, and the State presented additional evidence of deliberation by demonstrating that Defendant calmly watched Victim bleed to death and ignored his pleas for help, threatened the eyewitness to prevent her from calling for assistance, brought the murder weapon to the scene of the crime, and deceived officers once they arrived. In light of this evidence and the jury's guilty verdict on this charge, we affirm Defendant's conviction of first-degree, willful and deliberate murder.

## III.    CONCLUSION

**{51}** Because sufficient evidence supports the convictions and any evidentiary error at trial was harmless to the verdicts of guilt, we affirm Defendant's convictions of aggravated assault with a deadly weapon and first-degree, willful and deliberate murder.

**{52}  IT IS SO ORDERED.**

**C. SHANNON BACON, Justice**

**WE CONCUR:**

**MICHAEL E. VIGIL, Chief Justice**

**DAVID K. THOMSON, Justice**